**BROWNING DEBENTURE HOLDERS' COMMITTEE et al., Plaintiffs,**

v.

**DASA CORPORATION et al., Defendants.**

**No. 72 Civ. 1332.**

United States District Court, S. D. New York.

March 28, 1978.

Affirmed, Aug. 31, 1978.

Brewer & Soeiro by Bradley R. Brewer, New York City, for the plaintiffs.

Jacobs Persinger & Parker by I. Michael Bayda, Jeffrey I. Slonim, New York City, for defendant DASA Corp.

Sullivan & Cromwell by Edward W. Keane, David M. Olasov, New York City, for defendant Bank of New York.

## OPINION

OWEN, District Judge.

DASA Corporation and the Bank of New York were defendants in this bondholders' action. The suing bondholders were Simms C. Browning, Roy E. Brewer, and Bradley R. Brewer. The latter, Bradley Brewer, was also the attorney for the plaintiffs. DASA prevailed after trial. The Bank obtained a dismissal on the merits shortly before trial. DASA and the Bank have moved to enjoin the Brewer plaintiffs from instituting or maintaining new actions in the New York State courts based on the operative facts involved in this case. On February 10, 1978, after argument, I granted the requested relief from the bench, this opinion to follow.

A review of the plaintiffs' conduct of this case since its inception in early 1972 is required to place the instant motions in proper perspective.[1] At the outset, the named defendants included, among others, The Bank of New York (the Bank), DASA Corporation (DASA), and certain individual directors of DASA (although no process was served upon the individual directors until virtually the eve of trial in 1975); subsequently (also on the eve of trial) plaintiffs sought to amend their complaint by asserting allegations against DASA's law firm and certain individual members of that firm, as well. In a chain of events outlined in *Browning I,* the claims against all defendants were dismissed, one after another, on a variety of grounds, until nothing was

---

1. The procedural history of this case is described in some detail in two of the reported opinions it has produced. The first is my opinion rendered after trial, 431 F.Supp. 959 (S.D.N.Y. 1976) [hereinafter cited as *Browning I*]; the second is the opinion on appeal from *Browning I,* at 560 F.2d 1078 (2d Cir. 1977) [hereinafter cited as *Browning II*]. In *Browning II* the Court of Appeals affirmed *Browning I* "on the merits and as to all collateral issues raised on appeal except the award of attorneys' fees, which is remanded for a redetermination in

accordance with this opinion." *Browning II* at 1089. The case is now before me pursuant to that remand.

For other reported opinions in this case, see 357 F.Supp. 1010 (S.D.N.Y.1972); [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,194 (S.D. N.Y.1973), aff'd, 524 F.2d 811 (2d Cir. 1975); [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,727 (S.D.N.Y.1974) (summary of opinion), aff'd, *Browning II*; [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,071 (S.D. N.Y.1975), aff'd, *Browning II*.

left. The last of the allegations against DASA were finally dismissed after a full trial. Yet now, as an end to this protracted litigation at last comes into view, the Bank has been threatened with a new action, and DASA has actually been sued again, in New York State Supreme Court, on the same allegations that were the subject of this litigation.[2]

It was not due to any inherent complexity that this litigation proved to be so burdensome; the core of the blunderbuss allegations was simply that DASA Corporation (the obligor on debentures held by plaintiffs) and the Bank of New York (the indenture trustee) failed in various ways to live up to their duties to the debenture holders when DASA proposed to sell certain assets in 1972. What turned this case into a morass of unnecessary paperwork and superfluous courtroom appearances for the other litigants and for the court were the innumerable procedural steps taken by plaintiffs' counsel, Bradley R. Brewer, as to which the Court of Appeals noted:

> There was ample evidence to support a finding that Bradley Brewer acted in bad faith in taking some procedural steps (e. g., the appeal of mooted issues, the delay for discovery never undertaken, the motion for reargument made 5½ months after denial of appellants' motion for summary judgment, the making of frivolous motions for summary judgment against the Bank and Andersen, the motion to add parties on the basis of a misleading page of a letter taken out of

context, the dragnet subpoenas served on Andersen and others, the threats to depose numerous Bank officers, etc.).

*Browning II* at 1088–89. See also *Browning I* at 964–66.[3]

In light of this experience, defendants are understandably eager to prevent recommencement of the action, with the same facts, issues, and parties, in a new forum. Therefore, when Bradley Brewer advised the Bank of New York that it was to be sued again in state court, the Bank brought a pre-emptive motion here and thus commenced the rather complicated chain of events now at issue.

Specifically, on January 26, 1978. the Bank's counsel appeared before me (in the presence of Bradley Brewer) seeking an order to show cause why plaintiffs Bradley Brewer and Roy Brewer should not be enjoined from bringing suit against the Bank in any court on the basis of the same operative facts that have been involved in this case. On that day I not only signed the order to show cause, but also issued a temporary restraining order. I set February 1 as the date for a hearing on the request for a permanent injunction. The hearing was held as scheduled, and at its close I announced, "I will reserve decision and I will continue the stay." Transcript of Feb. 1, 1978, at 23.

At about 5:20 p. m. on the following day, February 2, Mr. Brewer—who subsequently maintained that he had not heard my announcement [4]—telephoned the Bank's coun-

2. Of the three members of the Browning Debenture Holders' Committee, only Bradley Brewer, and perhaps his father Roy E. Brewer, seek to pursue this action in the state courts. Mr. Browning dissociated himself from the Brewers and retained independent counsel even before the appeal from *Browning I*, and is not in any way involved in the events at issue here. In this opinion, therefore, except where the context otherwise requires, "plaintiffs" will refer only to the two Brewers.

3. Appendix A to *Browning I*, 431 F.Supp. at 968–74, reproduces the district court docket sheet in this case, which was then some six pages long; it has since swelled to more than ten pages.

4. Mr. Brewer's current position is that he "recalls [my] saying, 'I will reserve decision' but

nothing said about continuing the stay." Application [to the United States Supreme Court] for a Stay, dated Feb. 22, 1978, at 12. (This is despite his insistence that he "was listening quite attentively for a continuation." Transcript of Feb. 10, 1978, at 3). His earlier position was somewhat stronger; in his sworn Petition for Writ of Mandamus, dated Feb. 16, 1978, he stated unequivocally:

> At the end of the argument, and according to petitioner's very clear recollection, Judge Owen stated that he would reserve decision of the motion and rather hurriedly left the courtroom, since it was after 5:00 p. m. Mr. Keane, the bank's attorney, did not request a continuation of the restraining order, and the judge did not issue one.

*Id.* at 22.

sel and informed him that since the temporary restraining order was no longer in effect, he was commencing a new action against the Bank immediately. That night, without notice to anyone, Mr. Brewer commenced an action in the New York State Supreme Court against DASA Corporation, five individual directors of DASA, DASA's law firm, and two individual partners in that law firm, by serving a summons with notice upon one of those partners at his home. Service was made upon the law firm the next day.

On the morning of February 3, the Bank brought on a new order to show cause, which I signed along with a new temporary restraining order, setting the hearing for that afternoon. Mr. Brewer apparently failed to receive the notice of this hearing that was given. When he did not appear for that afternoon's hearing, the hearing was adjourned until February 6, at which time Mr. Brewer was ill, necessitating a further postponement until February 10. In the meantime, DASA Corporation presented an order to show cause, which I signed on February 6 along with an order temporarily restraining Mr. Brewer from further prosecuting the suit that he had commenced on February 2, and setting February 10 as the date for a hearing on DASA's request for an injunction against further prosecution of that or any other suit based upon the operative facts of this case.

On February 8, Mr. Brewer filed a notice of appeal from the Bank's temporary restraining order, and on February 10, after fifteen days of rather hectic activity, a hearing was held on DASA's motion and the Bank's new motion. At this hearing, and in a subsequent Petition [to the Court of Appeals] for a Writ of Mandamus, dated February 16, 1978, Mr. Brewer argued vigorously and at length that his filing of a notice of appeal two days before the hearing deprived this court of jurisdiction to consider the Bank's motion for an injunction. Before reaching the merits, therefore, this court's jurisdiction to proceed must be made clear.

■ Mr. Brewer asserts that his notice of appeal was filed pursuant to 28 U.S.C. § 1292(a)(1), which authorizes appeals from "[i]nterlocutory orders . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." It is well established, however, that "[a]n order granting or denying a temporary restraining order is *not* appealable as the grant or denial of an injunction under 28 USC § 1291(a)(1)." 9 J. Moore *et al.*, *Moore's Federal Practice* ¶ 110.20[5] at 253 (2d ed. 1975) [hereinafter cited as *Moore*] (emphasis supplied); *Grant v. United States*, 282 F.2d 165, 167 (2d Cir. 1960); *Hoh v. Pepsico, Inc.*, 491 F.2d 556, 560 (2d Cir. 1974).

■■ Of course, a mere label attached to an order cannot be decisive in determining whether the order is appealable; a true temporary restraining order must be distinguished from an order that may be so designated but that is in substance a preliminary injunction, by consideration of such indicia as "the subject matter of the order, its duration and whether or not notice and hearing of both parties were had." *Austin v. Altman*, 332 F.2d 273, 275 (2d Cir. 1964); *Morning Telegraph v. Powers*, 450 F.2d 97, 99 (2d Cir. 1971), *cert. denied*, 405 U.S. 954, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972). Thus, for example, a temporary restraining order that is continued without the consent of the parties beyond the 20 day maximum permitted by Fed.R.Civ.P. 65(b) may be treated as a preliminary injunction for the purposes of appeal. *Sampson v. Murray*, 415 U.S. 61, 86–88 & n.58, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Pan American World Airways, Inc. v. Flight Engineers' International Association, PAA Chapter, AFL–CIO*, 306 F.2d 840, 843 (2d Cir. 1962); *Truck Drivers Local Union No. 807, International Brotherhood of Teamsters v. Bohack Corp.*, 541 F.2d 312, 316 (2d Cir. 1976).

■ While there are undoubtedly cases in which it is difficult to determine how an order should be classified for the purpose of assessing appealability, see *Grant v. United*

*States, supra,* 282 F.2d at 167–68, this is not such a case. Here the restraining order was entered upon only very brief notice to Mr. Brewer; it remained in effect for less than 20 days; and the sole purpose for which it was issued was that for which temporary restraining orders are designed: "to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a[n] . . . injunction." *Pan American v. Flight Engineers, supra,* 306 F.2d at 842–43; see *Austin v. Altman, supra,* 332 F.2d at 275. Clearly this order had all the indicia of a temporary restraining order and none of those of a preliminary injunction.

■ Despite the manifest non-appealability of this court's restraining order, Mr. Brewer asserts in effect that he can terminate proceedings in this court, at least for the time being, merely by filing a notice of appeal. In support of this position, he quotes 9 *Moore* ¶ 203.11 at 734–35 as follows:

> The filing of a timely and sufficient notice of appeal . . . divests the district court of authority to proceed further with respect to such matters, except in aid of the appeal . . . .

Petition for Writ of Mandamus, dated Feb. 16, 1978, at 7. Mr. Brewer's quotation from *Moore,* however, omits the crucial qualification that follows it:

> The rule that the taking of an appeal divests the district court of jurisdiction would seem to presuppose the taking of a valid appeal from an appealable order . . . .

9 *Moore* ¶ 203.11 at 736, citing *Euziere v. United States,* 266 F.2d 88 (10th Cir. 1959), *vacated on other grounds,* 364 U.S. 282, 80 S.Ct. 1615, 4 L.Ed.2d 1720 (1960). As *Euziere* states,

> [a]n attempt to appeal a non-appealable order remains just that, an attempt. It is a nullity and does not invest the appellate court with jurisdiction, and consequently does not divest the trial court of its jurisdiction.

*Id.,* 266 F.2d at 91. *Accord, Ruby v. Secretary of United States Navy,* 365 F.2d 385, 388–89 (9th Cir. 1966) (en banc), *cert. denied,* 386 U.S. 1011, 87 S.Ct. 1358, 18 L.Ed.2d 442 (1967), holding that a district court may disregard a purported appeal from a non-appealable order because "[i]n the rare instance where the district court proceeds with a case under the mistaken belief that a notice of appeal is inoperative, the appellant may apply to the court of appeals for a writ of prohibition." *Id.,* 365 F.2d at 389.

■ *Moore* observes that the cases are not all in harmony, but views the Ninth Circuit's position in *Ruby* as "a very sound resolution" that "should be followed generally":

> To hold that the mere act of filing a notice of appeal automatically divests the district court of jurisdiction is to hold that a party can interrupt proceedings in the district court at will.

9 *Moore* ¶ 203.11 at 738. Although the Court of Appeals in this circuit apparently has not had occasion to rule on the issue, this view has been followed both in this district, *Lowenschuss v. Kane,* 392 F.Supp. 59 (S.D.N.Y.1974), and elsewhere, *Hodgson v. Mahoney,* 460 F.2d 326, 328 (1st Cir.) *cert. denied,* 409 U.S. 1039, 93 S.Ct. 519, 34 L.Ed.2d 488 (1972).

The soundness of this rule is particularly well illustrated by this case, the procedural history of which reveals repeated efforts to cause precisely the kind of unwarranted delay against which Professor Moore warns.

■ I conclude that the February 8, 1978 notice of appeal has no effect on this court's jurisdiction. Apart from the issues raised by that notice, it is unquestioned that this court has ancillary jurisdiction over these claims for equitable relief. *Southwest Airlines Co. v. Texas International Airlines, Inc.,* 546 F.2d 84, 89–90 (5th Cir.), *cert. denied,* 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977); *Samuel C. Ennis & Co., Inc. v. Woodmar Realty Co.,* 542 F.2d 45, 48

(7th Cir. 1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1112, 51 L.Ed.2d 543 (1977). Accordingly, I find that I had jurisdiction to proceed with the hearing on February 10, and to issue a permanent injunction at its close.

■ Turning to the merits, it must be noted at the outset that a federal court's power to enjoin state proceedings is subject to the Anti-Injunction Statute, 28 U.S.C. § 2283, which states:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

This limitation on federal judicial power, however, relates only to proceedings that have already been instituted in state courts. *Hill v. Martin*, 296 U.S. 393, 403, 56 S.Ct. 278, 80 L.Ed. 293 (1935); *Dombrowski v. Pfister*, 380 U.S. 479, 484 n.2, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *Boraas v. Village of Belle Terre*, 476 F.2d 806, 811 (2d Cir. 1973), *rev'd on other grounds*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); see generally 1A *Moore* ¶ 0.229[1]. The Anti-Injunction Statute therefore has no relevance to the motion of the Bank of New York, against which no state suit has been commenced. Since in this respect the Bank stands in a different posture from DASA, it is appropriate to deal with the two motions separately.

I turn first to the motion of the Bank. In 1972, DASA sought the approval of its debenture holders for a plan to raise needed cash by selling certain computer equipment, and offered in return to lower the conversion price of the debentures. The plaintiffs asserted that the Bank of New York, as indenture trustee, had an obligation—even with no default in prospect—to intervene in this matter, pass judgment upon the propriety and fairness of DASA's proposal, and communicate its opinion to the debenture holders prior to their vote. As expressed in Claim 4 of the complaint, the Bank's "failures to take affirmative action on behalf of the Debenture holders constituted a violation or violations by the Trustee of its fiduciary obligations to the Debenture holders under the Indenture and under the Trust Indenture Act." First Amended Complaint [hereinafter cited as Complaint], ¶ 23 at 46.

■ This claim was apparently carefully drafted to encompass not only federal claims arising under the applicable securities law, but also state-law claims (invoking the principle of pendent jurisdiction) based upon the fiduciary obligations that arose when the Bank entered into a contract to serve as trustee for the benefit of the debenture holders. The allegations, however, provided scant hope of recovery under either the federal securities laws or state contract law, since the Trust Indenture Act explicitly authorizes the trustee to limit its liability prior to default,[5] and the indenture itself not only did so in general terms,[6] but also specifically disclaimed any duty with respect to changes in conversion price.[7] It

---

**5.** Trust Indenture Act of 1939, § 315(a), 15 U.S.C. § 77*ooo* (a):

The indenture to be qualified may provide that, prior to default (as such term is defined in such indenture)—

(1) the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture . . . . .

See also 15 U.S.C. § 77*ooo* (d)(1).

**6.** Indenture between Cyber-Tronics, Inc. and The Bank of New York, Trustee, dated July 1, 1967 [hereinafter cited as Indenture] § 11.01(a):

Prior to such default [as defined in § 10.02] . . . . .

(1) the duties and obligations of the Trustee shall be determined solely by the express

provisions of this Indenture, and the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture, and no implied covenants and obligations shall be read into this indenture against the Trustee . . . .

**7.** Indenture § 4.10:

Subject to the provisions of Section 11.01, neither the Trustee nor any agent for conversion of the debentures shall at any time be under any duty or responsibility to make or cause to be made any adjustment of the conversion price . . . or to determine whether any facts exist which may require any of such adjustments, or with respect to the nature or extent of any such adjustments,

therefore seemed clear that virtually the only hope for plaintiffs lay in the possibility that state law might impose upon fiduciaries in the position of the Bank in this case some pre-default obligation that the Bank failed to fulfill, and that cannot be disclaimed by contract.[8]

Plaintiffs were allowed extraordinary leeway in litigating these extremely tenuous claims. In July 1974, two and a half years after commencement of this action and six months after its assignment to me, the Bank moved, pursuant to certain provisions of the indenture[9] specifically authorized by the Trust Indenture Act,[10] to require plaintiffs to file an undertaking before continuing their case against the Bank. In the exercise of discretion, I denied the motion.

Eight months later plaintiffs moved for summary judgment against the Bank on the issue of liability, but were unable to produce any legal support for their claim. Indeed, the applicable law[11] appeared to be flatly to the contrary of plaintiffs' theory. Not only did the Bank have no pre-default duty to intervene on the bondholders' behalf in negotiations between DASA and its debenture holders, but in fact it almost certainly did not even have the right to do so:

> when made, or with respect to the method employed in making the same.

**8.** Plaintiffs could enforce such a state-imposed obligation pursuant to Trust Indenture Act of 1939, § 323(b), 15 U.S.C. § 77www(b), which provides:

> The rights and remedies provided by this subchapter shall be in addition to any and all other rights and remedies that may exist . . . at law or in equity . . . .

**9.** Indenture § 10.11:

> [A]ny court may in its discretion require . . . in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit . . . .

**10.** Trust Indenture Act of 1939, § 315(e), 15 U.S.C. § 77ooo (e):

> The indenture to be qualified may contain provisions to the effect [of those quoted in note 9, *supra* ].

It seems unnecessary to argue or cite authority in support of the plain and obvious proposition that we must look to the trust instrument for the authority of the trustee.

*Colorado & Southern Ry. Co. v. Blair*, 214 N.Y. 497, 511, 108 N.E. 840, 842 (1915).

In denying plaintiffs' motion from the bench on March 28, 1975, I invited the Bank to renew its motion to require the posting of a bond in view of the apparently tenuous posture of the plaintiffs' case. [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,071 (S.D.N.Y.1975) at 97,754, *aff'd, Browning II.* I thus sought to protect the Bank with regard to further expense while allowing the plaintiffs to proceed to trial. The Bank accepted my invitation, and in an unreported ten page opinion dated April 18, 1975 (as amended by a supplemental order dated April 22, 1975), I reviewed the history of the case up to that time, assessed the merits of plaintiffs' claim against the Bank, and in the light of this review and assessment granted the motion for an undertaking, setting the bond at $25,000.[12] When plaintiffs informed me, just days before the scheduled trial, that they were not going to post this bond, I dismissed their claims against the Bank (by order dated May 8, 1975) "on the merits, with prejudice and with costs."[13]

**11.** Indenture § 18.08:

> This indenture and each debenture issued hereunder shall be deemed to be a contract made under the laws of the State of New York, and for all purposes shall be construed in accordance with the laws of such state.

**12.** Meanwhile, plaintiffs—astonishingly—had moved for reargument of their motion for partial summary judgment, requiring the Bank to expend more time and money in opposition.

**13.** Plaintiffs' assertion at the time, that their refusal to post a bond was due to financial inability, is somewhat suspect in light of Mr. Brewer's prior statement to the Bank's counsel that if an undertaking were ordered he would refuse to post it in order to force an adjournment of the trial. This statement, which had been placed before the court in the affidavit annexed to the Bank's motion to require an undertaking, dated April 9, 1975, was not denied by Mr. Brewer in his affidavit in opposition, dated April 15, 1975, nor in his subsequent affidavit dated April 16, 1975.

But this did not end the litigation of these claims, for the entire matter—not just the requirement of a bond, but indeed the merits of the claim itself—was argued on appeal. See Brief of Appellants Roy E. Brewer and Bradley R. Brewer, dated March 22, 1977 [hereinafter cited as Brief on Appeal] at 1, 16, 39–45. The Court of Appeals found the issues so clear that "little comment is required." With respect to the amount of the bond it found "no evidence that the district court abused its discretion in fixing a $25,000 bond in this case"; on the merits it concluded flatly that "the Bank had no duty to negotiate for a fair conversion price or to make known its views regarding the fairness of the price offered. The claim against it is frivolous." *Browning II* at 1083. Under the circumstances, the Court concluded that the motion for summary judgment against the Bank was one of the steps taken in bad faith by plaintiffs' counsel. *Browning II* at 1088.

It is on this record that the Brewers now seek to start this six-year-old action all over again in a new forum. They assert that they should be permitted to do so in order to litigate "heretofore unpleaded and undecided state law claims for breach of fiduciary duties owed by [the Bank] to the DASA bondholders outside the indenture and apart from federal law." Memorandum of Roy E. Brewer and Bradley R. Brewer in Opposition to Motion by the Bank of New York for a Permanent Injunction, dated Jan. 31, 1978, at 4. Moreover, they complain that because they declined to post the required bond they have had "no hearing or adjudication . . . on either the law or the facts with respect to *any* claim of breach of fiduciary duty by the bank, either federal or state." *Id.* (emphasis in original).

Plaintiffs' assertion that their pleadings were limited to federal statutory and state contract law claims is, to say the least, astonishing, since if that had been true, the most plausible element of their complaint against the Bank would never have been in this case, which would in all likelihood have resulted in a dismissal years ago. In addi-

tion, this present novel interpretation of plaintiffs' pleadings is wholly disingenuous in view of their repeated statements in the past that non-contract state law was being invoked as well. In their Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment as to Liability, dated March 14, 1975, at 9–11, plaintiffs asserted rights

> under the Trust Indenture Act, under principles of federal law under the securities statutes and the general powers of the district court as a court of equity, or under applicable state law principles of corporate law or equity.

*Id.* at 9. And in their Reply Memorandum with respect to that same motion against the Bank, dated March 28, 1975, at 6, the plaintiffs captioned one of their four major arguments as follows:

> THIS MOTION TURNS UPON THE MEANING OF SECTION 315(d) OF THE TRUST INDENTURE ACT AND STATE LAW PRINCIPLES OF EQUITY, NOT UPON THE TERMS OF THE INSTANT INDENTURE.

On appeal, they continued to press their argument that

> an indenture trustee is precluded . . . from limiting or eliminating by contract in the indenture the fiduciary duties otherwise imposed by common law equity principles . . . .

Brief on Appeal at 40. They specifically characterized this legal theory as a "state equity claim 'outside the indenture.'" *Id.* at 44. The simple fact is, as the record shows, that state fiduciary liability arising outside the indenture is what this action against the Bank has primarily been about.

Plaintiffs' second contention, that they have been deprived of any hearing or adjudication on any claim against the bank, is equally astonishing. The history recounted above suffices to show that their claims have received extremely generous consideration, and have been argued and decided not only in this court but also in the Court of Appeals for the Second Circuit. Indeed, the applicable statute requires that, in setting bond and in assessing attorneys' fees,

this court (and necessarily the reviewing court) act with "due regard to the merits and good faith of the claims . . . ." Trust Indenture Act of 1939, § 315(e), 15 U.S.C. § 77ooo(e). Plaintiffs' claims have been thoroughly briefed, argued, and examined, and they have been found to be without merit.

Nonetheless, plaintiffs assert that they are saved by a procedural technicality, to wit, the fact that when the death knell was finally sounded for their case against the Bank, it took the form of a dismissal for failure to post a bond. They cite *Saylor v. Lindsley*, 391 F.2d 965 (2d Cir. 1968), as standing for the proposition that "dismissal for failure to post a security-for-costs bond is not a judgment 'on the merits' for *res judicata* purposes." Letter from Bradley Brewer to Edward Keane dated Feb. 17, 1978.[14]

 The short answer to this argument is that, for the purpose of the Bank's motion, it does not matter whether there has been a judgment on the merits in this court or not. The Bank has appealed to the equity power of this court to spare it from further harassment at the hands of a plaintiff who has already caused it to spend six years litigating frivolous claims and bad-faith motions.

[I]t has long been settled that a court of equity may enjoin the institution of repetitious and baseless litigation.

*Rudnicki v. McCormack*, 210 F.Supp. 905, 909 (D.R.I.1962), *appeal dismissed*, 372 U.S. 226, 83 S.Ct. 679, 9 L.Ed.2d 714 (1963). See generally *id.*, 210 F.Supp. at 909–10; 1A *Moore* ¶ 0.229[3]. So long as the requisite basis for equitable relief is shown, this court would have the power to grant that relief even if there had not yet been any judgment on the merits here. Nothing in

*Saylor v. Lindsley* or in any other case requires the Bank of New York to be subjected to more than six years of frivolous litigation on the same allegations by the same plaintiffs.

The somewhat longer answer is that Mr. Brewer misrepresents *Saylor v. Lindsley*. In that case, a previous stockholder derivative action had been dismissed, prior to any litigation of the merits, because the plaintiff failed to post the required bond, and a different stockholder sought to take up the cudgel. The court's actual holding was that

under all the circumstances of this case, the dismissal "with prejudice" in the *Hawkins* action was not a disposition "on the merits" for the purpose of *res judicata*, and is not a bar to the timely commencement of a new action by another stockholder . . . .

*Saylor v. Lindsley, supra,* 391 F.2d at 968.

The primary circumstance that the court in *Saylor* found dispositive was that defendants there had never been put to the inconvenience of preparing to meet the merits, and thus would suffer no duplication of effort in being required to defend against the second action. *Id.* at 969, citing *Costello v. United States*, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). In this case, the Bank has repeatedly defended itself on the merits; not only did it litigate a motion for summary judgment, oppose a motion for reargument of that motion, and relitigate the entire matter on appeal, but in addition it undoubtedly made extensive preparations for trial, from which it was spared at the last minute only because plaintiffs declined to post bond.

Another circumstance that swayed the *Saylor* court to some extent was a confused record that left it unclear whether certain of plaintiff's claims in the first case had

14. A copy of this letter to the Bank's counsel, advising that in light of this newly discovered case it would be "both pointless and frivolous" for the Bank to oppose plaintiffs' prospective appeal from the permanent injunction I issued on Feb. 10, 1978, was forwarded to this court by Mr. Brewer, who noted in his covering letter of the same date:

Had a previously filed notice of appeal [the notice of Feb. 8, 1978] not ousted this court of jurisdiction to hear it, we would have made a motion for reargument based upon this authority, which we consider to be dispositive . . . . Indeed, I was aware of this case prior to February 8, 1978, and, as the remainder of this opinion shows, gave it the fullest possible weight.

ever actually been dismissed. *Id.* at 969–70. There is no such question in this case.

█ It is also of great significance that *Saylor* was a stockholder derivative action, in which as a practical matter the individual plaintiff represented the interests of an entire class of stockholders. Such a plaintiff cannot be allowed to defeat the interests of an entire class in a possibly meritorious claim simply by bringing suit and then refusing to post bond. In our case, plaintiffs represent only themselves. Their motion for class certification was denied because the bondholders that Mr. Brewer sought to represent as a class, upon being informed that they could revoke their consents to DASA's proposal in the light of this litigation, declined en masse to do so. [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,727 (S.D.N.Y.1974) (summary of opinion), *aff'd, Browning II.*

Perhaps most important, the *Saylor* action was brought by a different plaintiff from the one who had declined to post the bond. *Saylor* cannot be read as requiring any defendant to suffer repeated harassing lawsuits at the hands of a single plaintiff who skips from forum to forum filing actions and then refusing to post the appropriate bond.

█ I conclude that even if the principle of res judicata governed here, *Saylor* would be no bar to the relief the Bank seeks. And this would be so even if, as plaintiffs would have us believe, the state law issues they now seek to relitigate had never been raised in this court; for res judicata

> operates to bind the parties both as to issues actually litigated and determined in the first suit, and as to those grounds or issues which might have been, but were not, actually raised and decided in that action.

*Saylor v. Lindsley, supra,* 391 F.2d at 968. See also *Lee v. Terminal Transport Co.,* 282 F.2d 805 (7th Cir. 1960), *cert. denied,* 365 U.S. 828, 81 S.Ct. 713, 5 L.Ed.2d 705 (1961); *Wilkins v. American Export Isbrandtsen Lines, Inc.,* 46 A.D.2d 244, 362 N.Y.S.2d 168 (1974), *aff'd per curiam,* 38 N.Y.2d 758, 381

N.Y.S.2d 51, 343 N.E.2d 768 (1975). Since this court assumed pendent jurisdiction over the state contract law claim based upon the Indenture, plaintiffs were clearly free to invoke that same jurisdiction—as in fact they did—over their state equity claim based upon the same allegations.

It remains but to consider whether the Bank has an adequate remedy at law that might render inappropriate the equitable relief sought here.

> That a suit in equity does not lie where there is a plain, adequate and complete remedy at law is so well understood as not to require the citation of authorities. But the legal remedy must be as complete, practical and efficient as that which equity could afford.

*Terrace v. Thompson,* 263 U.S. 197, 214, 44 S.Ct. 15, 17, 68 L.Ed. 255 (1923).

█ In the context of this motion, the question of adequacy of the legal remedy virtually answers itself: If plaintiffs are allowed to start this litigation over at the first rung of a whole new judicial structure, it may well require years to dispose of this case and all of its appeals. While the Bank of New York may be able to afford the counsel fees that this continued litigation would entail, it is patently inappropriate to require it. There is no reasonable expectation that they could ever recover any substantial part of their fees from the plaintiffs who are concededly of little wealth. At some point plaintiffs will have to stop. In the absence of a showing of some good-faith basis for a new lawsuit, there can be no reason for not drawing the line here.

At oral argument on the Bank's motion, plaintiffs' counsel was given every opportunity to demonstrate a good-faith basis for proceeding. As the transcript of Feb. 1, 1978 reveals (at 11–12), none was forthcoming:

> [THE COURT]: What kind of a state claim are you talking about? You have been talking here and you spoke the other day in chambers about a state equitable principle. What is it that you have in mind to sue on? What is the state basis? What are you going to claim the bank

should have done under state principles that it didn't do?

MR. BREWER: I am reluctant to paraphrase pleadings that have not been drafted. I really won't undertake to do so here.

THE COURT: I am not asking you to dictate a pleading to your secretary for me. I am asking you, a lawyer, what is the basis of the claim?

MR. BREWER: I would say that the theory of recovery would be, fundamentally, that the bank which was in a fiduciary capacity failed to take that action which a reasonable man in its position as trustee would have taken in the circumstances.

THE COURT: What is the action? What action?

MR. BREWER: Whatever a reasonable man would have done to protect the interest.

THE COURT: What do you contend was the act that a reasonable man should have done?

MR. BREWER: In order to win the case, I don't think I really have to say that. All I have to prove is that they failed to do what a reasonable man would have done. The jury could determine [t]hat they had not.

Accordingly, the motion of the Bank of New York for a permanent injunction is granted.

Turning next to the motion of DASA, it seeks to enjoin Bradley R. Brewer not only from instituting additional court actions, but also from prosecuting the New York State court action already commenced. Here it is necessary to consider the applicability of the Anti-Injunction Statute, 28 U.S.C. § 2283, quoted at p. 95 above.

■ On its face, this statute appears to countenance only three exceptions to its general proscription of injunctions against pending state actions. Historically, however, the applicability of this statute has been limited not only by expressly stated exceptions, but also by a variety of judicially created exceptions: "[The statute] is intended to give effect to a familiar rule of comity and like that rule is limited in its field of operation." *Wells Fargo & Co. v. Taylor,* 254 U.S. 175, 183, 41 S.Ct. 93, 96, 65 L.Ed. 205 (1920). "In short, it goes merely to the question of equity in the particular bill." *Smith v. Apple,* 264 U.S. 274, 279, 44 S.Ct. 311, 313, 68 L.Ed. 678 (1924).

■ One of the traditional exceptions read into the statute by the courts applies to cases in which the state-court proceedings sought to be enjoined are baseless and vexatious. *600 California Corp. v. Harjean Co.,* 284 F.Supp. 843, 861–62 (N.D.Tex. 1968); *American Optometric Association v. Ritholz,* 101 F.2d 883, 886–87 (7th Cir.), *cert. denied,* 307 U.S. 647, 59 S.Ct. 1047, 83 L.Ed. 1527 (1939); *Jamerson v. Alliance Insurance Co. of Philadelphia,* 87 F.2d 253, 256 (7th Cir.), *cert. denied,* 300 U.S. 683, 57 S.Ct. 753, 81 L.Ed. 886 (1937). The rationale for this interpretation of the Anti-Injunction Statute is that Congress, in enacting this statute to promote federal-state comity, could not have intended that litigants whose actions are properly within the equity jurisdiction of the federal courts must be deprived of relief to which they would be entitled in a state court. If these authorities accurately reflect current law,[15] then DASA, like the Bank of New York, can obtain the relief it seeks simply by showing (as it easily can in this case) that the suit from which it seeks protection is baseless and vexatious.

However, it is unnecessary for DASA to rely on this traditional unwritten exception here, because this case falls squarely within the statute's express relitigation exception, which permits the enjoining of a pending state action by a federal court "to protect or effectuate its judgments." On its face,

---

15. The extent to which the 1948 amendments to the Anti-Injunction Statute preclude judicially created exceptions is in some doubt. Compare *Amalgamated Clothing Workers of America v. Richman Bros. Co.,* 348 U.S. 511, 514–16, 75 S.Ct. 452, 99 L.Ed. 600 (1955) with *id.,* 348 U.S. at 523–24, 75 S.Ct. 452 (Warren, J., dissenting) and *Leiter Minerals, Inc. v. United States,* 352 U.S. 220, 225–26, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957).

this exception is extraordinarily broad, allowing injunctions to issue in any case in which a federal court has rendered a judgment on the merits for the purposes of res judicata and collateral estoppel. While one commentator has pointed out that, in a system that traditionally trusts the state courts to give due respect to federal judgments, such a broad exception "is fundamentally inconsistent with traditional notions of judicial federalism . . .," that writer nonetheless concedes that "[w]hether or not the relitigation exception is justified in policy, it is firmly embedded in the statute . . . ." Redish, *The Anti-Injunction Statute Reconsidered,* 44 U.Chi.L.Rev. 717, 725 (1977).

 Because the relitigation exception is arguably stated overbroadly, the federal courts have been careful to exercise the discretion it confers "in the light of the historical reluctance of federal courts to interfere with state judicial proceedings." *Southern California Petroleum Corp. v. Harper,* 273 F.2d 715, 718 (5th Cir. 1960). In general, it may be said that injunctions under this exception have only been issued when the party seeking the injunction is able to make the kind of showing that, in the absence of the Anti-Injunction Statute, would have called the equity powers of the federal court into play. As has been observed,

> Without disparaging the state courts' ability to apply a res judicata defense, a federal court might be justified in enjoining the state proceedings on the ground that the burden on the party who prevailed in federal court in asserting the defense in multiple suits and fora would be considerable.

Redish, *supra,* 44 U.Chi.L.Rev. at 725 n. 39.

 Thus, when a party who has prevailed in federal court has been subjected to multiple lawsuits on the same issues in state fora, injunctive relief will be granted. *McCubbrey v. Boise Cascade Home & Land Corp.,* 71 F.R.D. 62 (N.D.Cal.1976). However, a multiplicity of state lawsuits is not a prerequisite to this equitable relief; where the federal litigation has been unusually burdensome or protracted and the losing party simply refuses to be bound by the outcome, even a single state-court action attempting to relitigate the same issue will be enjoined. *Southwest Airlines Co. v. Texas International Airlines, Inc., supra* p. 94; *Samuel C. Ennis & Co., Inc. v. Woodmar Realty Co., supra* p. 94.

The federal litigation in this case has been more than merely burdensome and protracted; it has been in substantial part vexatious. Hence the only issue to be determined in deciding this motion is whether the issues sought to be litigated in the newly-commenced state-court action are those that were decided, or could have been raised in a timely way and then decided, in this federal-court action.

While Mr. Brewer has commenced his new state action against DASA by service of summons without a complaint, pursuant to N.Y.C.P.L.R. § 3012, a notice annexed to the summons states that "[t]he object of this action is breach of fiduciary duty based on fraudulent and grossly inadequate terms in a proxy solicitation." · This is precisely the gravamen of Claim 3 in the now concluded federal action, which is captioned in part:

> False and Misleading Statements in and Omission of Material Statements of Fact from the DASA Solicitation Letter Dated March 9, 1972.

Complaint at 35.

This claim had many facets, however; some parts of it were withdrawn on the day before trial, others during the trial; of the portions that were not withdrawn voluntarily, some parts were dismissed during the trial, the rest after completion of the trial. See *Browning I* at 962–64. Therefore, on the oral argument on DASA's instant motion some attention was devoted to determining with greater specificity what aspects of this claim, or what other possible claims, Mr. Brewer intended to raise in state court. The crucial dialogue went as follows:

> THE COURT: . ` . . my question is what claim would you bring in the state court? And I really would like it stated "I claim that—"

MR. BREWER: One sentence. The state law which you refused to decide during the trial, which you dismissed as a matter of law, that claim—

THE COURT: What is the state law claim that I refused to decide? You claim that DASA did not do something or DASA did something. What is it?

MR. BREWER: You, your Honor, for reasons better known to you than to me, dismissed the claim on the second day of the trial as a matter of law and thereafter said and held that no evidence would be admitted.

THE COURT: What was the claim?

MR. BREWER: The claim was that DASA and its directors had breached fiduciary duties, primarily those implicit in the Federal Securities laws, which required them to offer and provide a fair consideration to bondholders for the concession of rights, the sacrifice of rights which they were being asked to give.

Transcript of Feb. 10, 1978, at 29–30.

There was a time when Mr. Brewer was prepared to concede—indeed to insist—that this claim was dismissed on the merits. In a post-argument letter to the Court of Appeals, dated April 4, 1977, at 7, Mr. Brewer said of this particular aspect of Claim 3:

It is clearly established on the record before this Court that plaintiffs stated an equity claim under state as well as federal law, which Judge Owen decided on its merits based upon the Chancellor's decision in *Harff* [*infra* p. 103]. There is no issue before this Court as to whether or not that claim was sufficiently pleaded. There is only the question whether it was decided correctly or incorrectly by the district court.

Mr. Brewer's current position, however, is directly to the contrary:

[P]laintiffs set forth in Claims 3 and 4 of their amended complaint only federal statutory claims . . . . Plaintiffs did not allege in that complaint any so-called "pendent" state law claims.

Memorandum of Roy E. Brewer and Bradley R. Brewer in Opposition to Motion by DASA Corp. for a Permanent Injunction, dated Feb. 9, 1978 [hereinafter cited as Memorandum of Feb. 9, 1978], at 1–2.

Mr. Brewer explains this about-face as a concession to the Court of Appeals, which in *Browning II* confined its analysis of Claim 3 to federal law issues. He chooses to interpret this as a declaration by the Court of Appeals that the state-law issues were not decided by this court after all. In this he misconstrues the nature of final judgments and of appellate review. An issue that has been decided upon trial does not become undecided simply because the reviewing court does not choose to discuss it. This is especially so with respect to an issue that was argued at length to the appellate court,[16] where the decision of the appellate court concludes with an explicit affirmance "on the merits and as to all collateral issues raised on appeal . . . ." *Browning II* at 1089. Taking the Court of Appeals' decision in this case as a whole, it is inconceivable that the absence of comment on the state-law issues raised by the appellants was intended as a signal that Mr. Brewer should commence a new action based upon those issues.

Mr. Brewer argues further, in essence, that even if the district court did decide these state-law issues, the absence of an explicit discussion of those issues by the Court of Appeals means that "plaintiffs

---

**16.** See Brief on Appeal at 1, 2–3, 15, 17–20, 23–24, 31–34, 35–36, 38 n. *. Indeed, the state-law claims were central to the appeal, as Mr. Brewer made clear in the opening pages of his brief:

Plaintiffs based this action mainly upon fiduciary and related proxy disclosure obligations which they maintained the defendants owed them under two related bodies of law:
(a) the federal securities laws, and
(b) state law equity principles.
Among other things, plaintiffs contended that they were owed fiduciary duties under both bodies of law.
*Id.* at 3.

have not had their 'day in (federal) court,' including appeal, on the merits of their state law fiduciary duty cause of action." Memorandum of Feb. 9, 1978, at 3; see also Transcript of Feb. 10, 1978, at 28–37. He therefore apparently considers it appropriate to seek in state court a remedy for what he perceives to be the erroneous decision rendered at the trial.

It need hardly be stated that appeal from the federal courts does not lie to the state courts; if plaintiffs were dissatisfied with their treatment with respect to this issue at the hands of the federal judiciary,[17] their remedy was further appeal within the same system.

It is worthy of comment, however, that Mr. Brewer has in any case made no showing whatever that the judgment of which he complains was, in fact, erroneous. In rearguing the merits of his state-law claim for the purpose of the present motion, Memorandum of Feb. 9, 1978, at 7, Transcript of Feb. 10, 1978, at 32–33, 35–36, Mr. Brewer relies primarily on *Harff v. Kerkorian,* 347 A.2d 133 (Del.1975) (per curiam), *aff'g in part and rev'g in part* 324 A.2d 215 (Del.Ch.1974). In that case Chancellor Quillen had held that

> unless there are special circumstances which affect the rights of the debenture holders as creditors of the corporation, e. g., fraud, insolvency, or a violation of a statute, the rights of the debenture holders are confined to the terms of the Indenture Agreement pursuant to which the debentures were issued.

**17.** Transcript of Feb. 10, 1978, at 36:

> MR. BREWER: . . . I don't believe that you did decide the merits of the state law cause of action. If you did, the Second [C]ircuit did not agree that you had . . .

> . . . . .

> THE COURT: You believe I had in your letter of April 4, 1977 [quoted above at p. 102].

> MR. BREWER: I hoped that they would find that you had and I also hoped that they would find that you failed to give us a fair trial and that you committed reversible error in failing to acknowledge the significance of the Delaware Supreme Court's reversal in

324 A.2d at 222. Upon finding that plaintiffs had failed to plead any such special circumstances, *id.* at 221, or to allege any default under the indenture, *id.* at 222, the Chancellor granted summary judgment to the defendants. On appeal, the Delaware Supreme Court determined that despite "plaintiffs' demonstrated reluctance to use the word 'fraud'" they had sufficiently raised that issue in their pleadings; it therefore remanded the case for trial. 347 A.2d at 134.

Mr. Brewer correctly notes that the Chancellor's opinion was given some weight at the trial at the time of the dismissal of this claim,[18] and that I declined to reopen the issue upon being told of the Delaware Supreme Court's subsequent reversal of that opinion. That is because in this case the facts did not involve fraud or other special circumstance of the sort that the two Delaware courts agreed would support a cause of action by debenture holders, but rather simply revealed that the corporation, in deciding upon the terms of its offer to the debenture holders, had placed the interests of its stockholders above those of the debenture holders, just as any business would in dealing with its creditors. Thus, dismissing this claim, I held only that

> there was no such duty [to consider debenture holders' interests in setting the proposed new conversion price] *as long as all the facts were fairly set forth* from which the debenture holders could reach an intelligent, well-informed conclusion as to whether or not to accept the proposal . . . .

> the *Harf[f]* case, but all those hopes came to naught . . . .

**18.** Delaware law is, of course, at most only persuasive with respect to the claims of debenture holders against DASA, which is alleged to be

> incorporated under the laws of the Commonwealth of Massachusetts, having its office and principal place of business in the State of Massachusetts . . ., having an office and principal place of business in the State of New York at THE BANK OF NEW YORK . . . . for purposes of its relationship with the Debenture holders . . . .

Complaint, ¶ 6 at 12. See also note 11, *supra.*

*Browning I* at 962 (footnote omitted, emphasis supplied).[19]

Mr. Brewer string-cites several other cases, Memorandum of Feb. 9, 1978, at 8–9, purportedly supporting this claim. It is difficult to discern the relevance of some of those cases to this one, but in general, his authorities may be said to stand for the proposition that corporate directors should not commit fraud, self-deal, misapply corporate funds, and the like. None of these authorities, however, suggests that the allegations at issue here might *make out a* claim for relief.

 The merits of plaintiffs' so-called state-law claim against DASA having been argued by the parties, considered by this court, and appealed to the Court of Appeals, and that claim having been dismissed on the merits, plaintiff is barred by res judicata from relitigating the point. Fed.R. Civ.P. 41(b); *Glick v. Ballentine Produce, Inc.*, 397 F.2d 590, 592–93 (8th Cir. 1968); *Bartsch v. Chamberlin Company of America, Inc.*, 266 F.2d 357, 358 (6th Cir. 1959). This dismissal was not for a mere defect in the pleadings, see *Nasser v. Isthmian Lines*, 331 F.2d 124, 127 (2d Cir. 1964); rather, this claim was dismissed for failure to produce even an iota of support for the legal theory upon which it is based.

Under the circumstances, there is *no* question that DASA is entitled to an injunction.

[T]he subjecting of another to repeated, baseless and vexatious suits at law on some particular subject matter is, without reference to other considerations, a sufficient ground for the issuance of an injunction against the perpetrator.

*Meredith v. John Deere Plow Co.*, 261 F.2d 121, 124 (8th Cir. 1958), *cert. denied*, 359 U.S. 909, 79 S.Ct. 586, 3 L.Ed.2d 574 (1959).

 It is appropriate to comment briefly upon the other defendants to Mr. Brewer's state-court suit: the individual directors of DASA, DASA's law firm, and the individual partners in the law firm. Any effort to raise against these defendants claims that were or could have been decided in the federal-court action against DASA is barred for two reasons. First, the principle of res judicata bars subsequent actions not only between the same parties, but also between those in privity with the original parties. *Saylor v. Lindsley, supra*, 391 F.2d at 968. DASA's directors and lawyers are privies of DASA with respect to the operative facts of this case. Second, "[t]he relitigation exception of § 2283 applies not only when the prior federal judgment is *res judicata* but also when the doctrine of collateral estoppel, or issue preclusion, is relied upon."

19. In the Court of Appeals, Mr. Brewer's argument on the merits was quite different. Rather than relying on the Delaware Supreme Court's reversal in *Harff*, he relied upon the Chancellor's opinion, which he contended had been misapplied in the dismissal of this claim:

[This court] based that dismissal upon the court's pure conclusion of law that no fiduciary duty *of any kind* is owed by a corporation or its directors to holders of convertible bonds . . . [and] cited as its sole authority *for the nonexistence of any such duty* . . . a Delaware trial court decision, *Harff v. Kerkorian* . . . .

Brief on Appeal at 32–33 (emphasis supplied). To same effect, see *id.* at 35.

This is a misrepresentation. The trial transcript is unambiguous:

[MR. BREWER]: Their duty there was a fiduciary duty to give these people a fair conversion price . . . .

THE COURT: It is my judgment, Mr. Brewer, that the fiduciary duty *that you were*

*talking about* . . . does not exist as a matter of law [citing *Harff*].

. . . [The debenture holders] have a right, as you said at one point, to accept it or reject it and *they have a right to be given material information* to exercise that choice, and that is the part of the case that I have been pleading with you to get to for about two and a half days, which is the misstatements or omissions that are alleged . . . .

. . . [I]f the debenture holders don't like the price that is arrived at, they can reject it and *they are entitled* in deciding whether to accept or reject it *to be given full information*, and so let's get down now to your allegations as to whether or not they were given full information.

Transcript of June 4, 1975, at 59–62 (emphasis supplied).

*Samuel C. Ennis & Co., Inc. v. Woodmar Realty Co., supra*, 542 F.2d at 49. Thus even if it could be argued that these additional parties were not privies of DASA, Mr. Brewer is properly enjoined from relitigating against them the issues decided adversely to plaintiffs in this court.

A final word about federalism is in order. There has seldom been a case in which the words of Justice Reed, in the dissent that was vindicated by the 1948 amendment adding the relitigation exception to the Anti-Injunction Statute, were more appropriate:

> [The] alternative [to allowing injunctions against relitigation] is that a federal judgment entered perhaps after years of expense in money and energy and after the production of thousands of pages of evidence comes to nothing that is final. It is to be only the basis for a plea of *res judicata* which is to be examined by another court, unfamiliar with the record already made, to determine whether the issues were or were not settled by the former adjudication.

*Toucey v. New York Life Insurance Co.*, 314 U.S. 118, 144, 62 S.Ct. 139, 149, 86 L.Ed. 100 (1941) (Reed, J., dissenting). In a case such as this it would be a disservice not only to the defendants, but also to the state judiciary, to allow the entire record to be placed in the lap of the New York State courts to be argued over by lawyers and puzzled over by judges for years to come. While comity requires respect for the ability of the state courts to decide the issue of res judicata properly, it also requires sympathy for their calendar problems and for the task that would confront them were this litigation to be imposed upon them.

The motions are granted. The proposed order of DASA and the Bank, earlier submitted on notice, is herewith signed.