STATE OF MICHIGAN, the Administrator of The United States Environmental Protection Agency, Greenfield Construction Company, Inc., Lanzo Construction Company, Inc., Giannetti Construction of Michigan, Inc. and Rocco Ferrera & Company, Inc., Plaintiffs,

v.

The CITY OF ALLEN PARK: The Le Blanc Tile Drainage District: the Drainage District For Ecorse Creek Pollution Abatement Drain No. 1: the County of Wayne: Charles N. Youngblood, the Wayne County Drain Commissioner, Defendants.

STATE OF MICHIGAN and Robert Landisch, Plaintiffs,

v.

The CITY OF ALLEN PARK, Michigan, a Michigan municipal corporation, Defendant.

ALLEN PARK HOMEOWNERS OF LE BLANC DRAIN DISTRICT, INC., a Michigan Non-Profit Corporation, Plaintiff,

v.

William RUCKELSHAUS, Administrator of United States Environmental Protection Agency and the United States Environmental Protection Agency, Defendants.

Civ. A. Nos. 79–74681, 79–74682 and 83–CV–2732–DT.

United States District Court, E.D. Michigan, S.D.

Nov. 2, 1983.

Stephen F. Schuesler, Asst. Atty. Gen., Environmental Protection Div., Lansing, Mich., for State of Mich.

Karl R. Overman, Asst. U.S. Atty., Detroit, Mich., for U.S.E.P.A.

Abba I. Friedman, Laurence A. Berg, Hyman, Gurwin, Nachman, Friedman & Winkelman, Southfield, Mich., for Const. Companies.

Michael H. Feiler, Farmington Hills, Mich., for City of Allen Park.

Jeffrey A. Supowit, Detroit, Mich., for Wayne County Drain Com'r.

Harry S. Ellman, Southfield, Mich., for Allen Park Homeowners of Le Blanc Drain Dist., Inc.

Charles R. Moon, Detroit, Mich., Bond Counsel.

FEIKENS, Chief Judge.

## OPINION

This matter arises out of a long standing dispute concerning the water quality of the North Branch of the Ecorse Creek. A final order and judgment in this matter was entered on June 30, 1980. That judgment required, *inter alia*, that defendant Allen Park take certain measures to alleviate water pollution. Allen Park here moves to have that order modified pursuant to Fed. R.Civ.P. 60(b)(5). Jurisdiction is conferred pursuant to Section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

## I. BACKGROUND

Although the procedural and substantive history of this case was set out in detail in prior opinion, *State of Michigan v. Allen Park*, 501 F.Supp. 1007 (E.D.Mi.1980), a brief review is again appropriate. This matter involves problems of water quality in the North Branch of the Ecorse Creek, which flows through the communities of Dearborn Heights, Allen Park, Lincoln Park, and Ecorse. The poor water quality in Ecorse Creek is caused by combined sewer overflows which periodically dump untreated sewage into the basin. Such discharge occurs during periods of relatively heavy rain or snow melt which overtax the combined storm water and sewer system and cause the mixture of storm water runoff and raw sewage to be discharged through various outfalls directly into the Creek.

The water quality problems of the Ecorse Creek have long been recognized. A study by the Michigan Department of Natural Resources (DNR) concluded as early as 1969 that the combined sewage discharge of Allen Park and other communities was degrading the water quality of the Ecorse Creek and causing "conditions believed to be a hazard to public health, which result in a public nuisance and which cause destruction of fish life." *Ecorse River Water Quality Study*, State of Michigan Water Resource Commission, Department of Natural Resources, August 1969. In November of 1970, the DNR ordered the communities within the Ecorse Creek Basin to correct the problem, and the Wayne County Drain Commissioner authorized a study of the sewer system to determine possible solutions. This study culminated in the report, *Facility Planning Study: Pollution Abatement of Ecorse Creek, Element 2-Combined Sewer Areas, Final Plan* (Wayne County Drain Commissioner, February 1977). In that report three alternatives were evaluated on the basis of cost, pollution abatement, public acceptability, environmental impacts and implementation capability. The study concluded that Alternative I, sewer separation, was the most cost effective plan. That alternative required Allen Park and several other communities to construct parallel sewer systems so that storm water runoff could be kept separate from sewage. After such separation, if wet weather caused an overflow, only storm runoff, and not raw sewage, would be discharged into Ecorse Creek.

Alternative I was selected by the North Branch of Ecorse Creek Drain Improvement Board following a public hearing held on the matter on January 27, 1977. This alternative received wide public support from various cities and agencies, including Allen Park. On June 14, 1977, Allen Park passed a resolution approving the financing

of the drainage improvements, and the project seemed to be well on its way.

In early 1978 the Drainage District Board for the Ecorse Creek Pollution Abatement Drain No. 1 proposed an apportionment of costs which was subsequently confirmed in April 1978. After this apportionment and the taking of bids on the project, it became clear to Allen Park that, despite an 80% funding of the project by federal and state grants, Allen Park would have to pay out significant outlays to fund the project. Shortly thereafter, Allen Park began to fall behind the required completion schedule for the project. On November 28, 1978, the DNR issued notices of violation to Allen Park for reason of noncompliance with schedule.

On December 12, 1979, a suit was filed against Allen Park seeking to require the city to proceed with the project in accordance with schedule. Allen Park defended in this action by claiming that it was not contributing to the pollution in Ecorse Creek, that the decision to approve Alternative I was arbitrary and capricious, and that the city was precluded from financing the project by the then recently enacted Headlee Amendment to Article IX of the Michigan Constitution. Allen Park also counterclaimed contending that the Environmental Protection Agency (EPA) failed to comply with the requirements of the National Environmental Policy Act (NEPA) of 1969, 42 U.S.C. § 4321 *et seq.*, with regard to the preparation of an Environmental Impact Statement, and that the alternative ultimately selected was not the best alternative. After a prolonged trial on the matter, I entered a final order and judgment in the cause on June 30, 1980, finding against Allen Park in each of the particulars, requiring Allen Park to proceed with the funding and construction of the project, and retaining jurisdiction for the purpose of implementing the order. An opinion was issued on November 6, 1980, setting forth the reasons behind that

judgment. Defendant Allen Park appealed that judgment to the U.S. Court of Appeals for the Sixth Circuit, which affirmed the decision,[1] and to the U.S. Supreme Court, which denied certiorari.[2]

In 1981 litigation erupted again when Allen Park filed a complaint for superintending control in Wayne County Circuit Court (Civil Action No. 81–100961–AS), seeking certiorari on an apportionment determination. Following removal and a hearing before this Court, I held that the apportionment of costs for the project was proper. *Allen Park v. Ecorse Pollution Abatement Drain No. 2 Drainage District*, 518 F.Supp. 1079 (E.D.Mi.1981). Allen Park again appealed this decision to the Court of Appeals, which affirmed,[3] and to the U.S. Supreme Court, which denied certiorari.[4]

Even after this, Allen Park delayed proceeding with the project. Because of this delay, and in response to a motion to set compliance schedule filed by plaintiff contractors in this action, on February 15, 1983, I entered a schedule of compliance which set forth in minute detail the steps which Allen Park was to take in proceeding with the project.

Subsequent to the entry of the compliance schedule of February 15, Allen Park again began pressing its contention that the sewer separation alternative was not the best alternative for alleviating the pollution of Ecorse Creek. Subsequent to this Court's Judgment of June 1980, Allen Park retained an engineering firm, Williams & Works, for the purpose of conducting further studies on the various alternatives. In October of 1982, that firm issued a report entitled *Combined Sewer Overflow Pollution Control Alternatives for the City of Allen Park*. The report concluded, *inter alia*, that there were a number of alternatives which did not require sewer separation and which would be more cost effective than the previously mandated Alterna-

1.  667 F.2d 1028 (6th Cir.1981).

2.  456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 443 (1982).

3.  708 F.2d 722 (6th Cir.1982).

4.  —— U.S. ——, 103 S.Ct. 2464, 77 L.Ed.2d 1340 (1983).

tive I. Allen Park disseminated the report to a number of individuals and agencies, including the EPA.

On March 18, 1983, the EPA petitioned this Court for an opportunity to review the Williams and Works Report. At the conclusion of a hearing held on that matter, I allowed the EPA to consider such report with the caveat that any alternative considered must lead to at least equal pollution abatement, be less costly, and be able to be implemented within the same time frame as the presently selected alternative. On April 27, 1983, I issued an order reinstating this case for purposes of further proceedings and consideration, and on May 10, 1983 held a conference at which the EPA presented its opinions on the various alternatives, along with a study entitled *Technical Evaluation, Impact of Combined Sewer Overflow Control Alternatives for the Ecorse Creek Basin, Wayne County, Michigan (May 1983)*. The EPA stated its belief that there were two alternatives which might be more cost effective than the chosen alternative, but also stated that it was not abandoning its position with regard to the original alternative. The EPA also made clear its position that, although the two suggested alternative plans may be preferable, the EPA could not guarantee funding for them. At the conclusion of that conference I stated on the

record that no reason was demonstrated for abandoning the original alternative or for reinstituting the alternative evaluation procedure. Allen Park was not satisfied with that relatively informal manner of hearing the matter, and reserved the right to file a motion to again bring the matter before the Court.

## II. DISCUSSION

■ On August 19, 1983, Allen Park brought a petition for modification, pursuant to Fed.R.Civ.P. 60(b)(5), seeking to have the court modify its June 30, 1980 final order and judgment. This petition brought on a spate of other motions which were addressed at a hearing held on October 3, 1983.[5]

■ Fed.R.Civ.P. 60(b)(5), upon which Allen Park relies in requesting modification, provides in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: …
>
> (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application;

---

5. It should be noted that heard on this same day were matters involved in a separate action brought by an Allen Park homeowners group, *Allen Park Homeowners of the Le Blanc Drain District, Inc. v. William Ruckelshaus*, No. 83–2732. This action, like the petition for modification, sought reconsideration of the June 30, 1980 final order and judgment. However, rather than intervening in the instant action, the Homeowners chose to institute a new action, claiming that the EPA violated the requirements of NEPA by failing to prepare an Environmental Impact Statement for the project in question. This, of course, was the precise argument that was decided in the negative in the earlier case. In that the Homeowners' action was admittedly requesting the same relief (modification of the June 30, 1980 final order and judgment) on the same basis (the Williams & Works and EPA technical reports), as the petition for modification in the principal matter, I ordered that the two matters be consolidated pursuant to Fed.R. Civ.P. 42(a) for joint determination. For this

reason, the Court need not address defendants' motion for summary judgment in the newly filed case.

The Homeowners' Association argues that its cause should not be consolidated, and that they should be given an opportunity to argue the matter anew. This argument is unavailing. It is established law that when a governmental entity litigates a matter involving diffused private rights (such as those involving tax liabilities), private citizens are bound by the results. *Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958); *Southwest Airlines Co. v. Texas International Airlines*, 546 F.2d 84 (5th Cir.1977); *Berman v. Denver Tramway Co.*, 197 F.2d 946 (10th Cir.1952). *See also* 18 Wright, Miller & Cooper, Federal Practice and Procedure, § 4458 n. 25 (1981). If such were not the case, the number of times a matter could be subject to relitigation would be limited only by the number of citizens available to litigate the matter.

Allen Park correctly notes that it is within a court's equitable powers to modify an injunction or judgment which is prospective in application. In *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), Justice Cardozo acknowledged this power in stating, "We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions..." *Id.* at 114, 52 S.Ct. at 462.[6] In commenting on the appropriate exercise of this power, Justice Cardozo went on to state:

> There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting....
>
> The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

*Id.* at 119, 52 S.Ct. at 464.

In forming a rule of general applicability from the above quoted language in *Swift*, then Judge Blackmun of the United States Court of Appeals for the Eighth Circuit stated:

> We glean, from this, certain factors of importance: (1) that, where modification and amendment of an existing decree is under consideration, there are "limits of inquiry" for the decree court and for the reviewing court; (2) that the inquiry is "whether the changes are so important that dangers, once substantial, have become attenuated to a "shadow"; (3) that the movants must be "suffering hardship so extreme and unexpected" as to be regarded as "victims of oppression"; and (4) that there must be "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions." Placed in other words, this means for us that modification is only cautiously to be granted; that some change is not enough; that the dangers which the decree was meant to foreclose must almost have disappeared; that hardship and oppression, extreme and unexpected, are significant; and that the *movants' task is to provide close to an unanswerable* case." (emphasis added).

*Humble Oil & Refining Co. v. American Oil Co.*, 405 F.2d 803, 813 (8th Cir.1969).

The U.S. Court of Appeals for the Sixth Circuit has recently commented on the propriety of granting modification of a decree pursuant to Fed.R.Civ.P. 60(b). *Stotts v. Memphis Fire Dept.*, 679 F.2d 541 (6th Cir.1982). In *Stotts* the Court stated that, "The relief granted under Fed.R.Civ.P. 60(b) is extraordinary and may be granted only upon a showing of exceptional circumstances," and that "A change in the facts upon which the consent decree is based usually constitutes an exceptional circumstance." *Id.* at 562. The Court also noted:

> A consent decree may also be modified "where a better appreciation of the facts in the light of experience indicates that the decree is not properly adapted to accomplishing its purposes." *Chance v. Board of Examiners*, 561 F.2d 1079, 1086 (2d Cir.1977), *quoting King-Seeley Thermos Co. [v. Aladdin Industries,*

---

**6.** While *Swift*, along with a number of other cases cited in briefs, dealt with the power to modify an *injunction*, it is argued that this power is equally applicable to cases involving the modification of *judgments* that remain prospective in nature. While this may be true, it is worth noting that the only reason *this judgment* continues to remain prospective in nature with regard to Allen Park is Allen Park's own lack of diligence in complying with the order and judgment.

*Inc.*], 418 F.2d [31] at 35 [ (2nd Cir. 1969) ].

*Id.* Finally, it has also been stated that: In determining whether to exercise the power to relieve against a judgment under 60(b), the courts must engage in the delicate balancing of "the sanctity of final judgments, expressed in the doctrine of res judicata, and the incessant command of the court's conscience that justice be done in light of *all* the facts." (footnote omitted).

*Compton v. Alton Steamship Co.*, 608 F.2d 96, 102 (4th Cir.1979). *See also System Federation No. 91, Railway Employes' Department, AFL–CIO v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); *Bankers Mortgage Co. v. U.S.*, 423 F.2d 73 (5th Cir.1970).

■ It is with these principles in mind that I must decide whether modification is appropriate in this case. Allen Park seeks modification based upon information and understanding that has allegedly become available only subsequent to the entry of the June, 1980 order and judgment. The information and evidence which Allen Park proffers in support of modification consists principally of two parts: the study by the engineering firm of Williams & Works, a firm retained by Allen Park for the express purpose of finding alternatives to the plan which Allen Park was not able to shed itself of in the courts; and the report and opinion of the EPA, which states that there are several alternatives which may be better than that selected, but which does not promise funding for the new alternatives nor abandon the already funded previously selected alternative.

Neither of these studies is based upon information that was wholly unavailable at the time of the initial determination of this matter. Allen Park could have made these same heroic efforts at producing information relevant to the evaluation of the various alternatives at a time prior to this court's determination of the matter, but it did not.

This new information is hardly the type described by Justice Cardozo that causes hardship "so extreme and unexpected" as to justify saying that those bound by the decree are "victims of oppression." *Swift, supra* 286 U.S. at 119, 52 S.Ct. at 464. In *Ryan v. United States Lines Co.*, 303 F.2d 430 (2d Cir.1962), the court held that the results of a physical examination performed after a trial and entry of judgment was not the sort of new evidence that would justify the modification of a judgment under Fed.R.Civ.P. 60(b). Similarly, in *Allinsmith v. Funke*, 421 F.2d 1350, 1351 (6th Cir.1970), the Sixth Circuit held that the fact of persons changing their minds subsequent to the entry of judgment does not establish the basis for modifying a decree. This precedent is applicable here. Allen Park has conducted further studies after the judgment was entered because it did not care for the Court's decision. The EPA has changed its collective mind, or is at least waffling, based in part upon these further studies. This is not the sort of basis upon which a modification of a final order and judgment can be predicated.

This is not simply a case where justice, for its own sake, should not be delayed. This is a case where every additional moment of delay is an additional moment where a known health hazard is permitted to continue to impact upon the health and enjoyment of life of those who live in and around the Ecorse Creek Drainage Basin. In a sense, the system of justice has already let these people down. A known health hazard has been permitted to exist for over 13 years while various administrative and judicial proceedings interminably ground along their way. Now we have at hand a solution to the problem which all parties agree will help alleviate the problem. We have state and federal funding for the project. We have all of the communities involved, with the exception of Allen Park, well on their way or completed with implementing their portions of the project. And we have Allen Park, attempting yet again to reopen the proverbial can of worms and begin anew the evaluation of alternatives.

It would be nothing short of manifest injustice to allow Allen Park to force a reevaluation of alternatives at this time.

All the other communities involved have proceeded with diligence in implementing and executing their responsibilities, including sewer separation, under the June, 1980 order and judgment. These communities have spent millions of dollars and committed valuable municipal resources to carrying out their duties under the court order, but they have not been able to reap the benefits of these expenditures because of Allen Park's delay.[7] It is interesting to note that the EPA conceded during the May 10, 1983 hearing that the "new alternatives" were made possible for Allen Park in part by the fact that the other communities had already discharged their duties under the court order.

Allen Park states that all it desires is an evidentiary hearing on the propriety of the various alternatives. To hold such a hearing would be to virtually retry the entire matter. It would require the production of vast amounts of technical evidence and expert testimony. Moreover, the history of this case virtually guarantees that, whatever the ultimate disposition of the matter, another foray through the appeals process would be required. Even then, after years of additional delay, what would prevent another request for modification and further delay?

A review of the papers and reports submitted by the parties, along with the arguments presented at the various hearings held on this matter, make it clear that this is not the sort of case in which modification under Fed.R.Civ.P. 60(b) is appropriate or permissible. For this reason, Allen Park's petition for modification is denied.

■ Motion has also been brought by defendants Drain Commissioner and Drainage Districts for the issuance of a writ of injunction enjoining all parties from instituting or carrying on any further litigation or administrative proceedings which will have the effect of delaying compliance with the June, 1980 order and judgment. The

above discussion with regard to the petition for modification hopefully serves to demonstrate the protracted and delay-ridden nature of this case. It is well established that a court has the power under the All Writs Act, 28 U.S.C. § 1651,[8] to enjoin the repetitive litigation of the same issue. *In the matter of Hartford Textile Co.*, 681 F.2d 895 (2d Cir.1982); *Pavilonis v. King*, 626 F.2d 1075 (1st Cir.1980); *Lacks v. Fahmi*, 623 F.2d 254 (2d Cir.1980); *Heritage Hills Fellowship v. Plouff*, 555 F.Supp. 1290 (E.D.Mi.1983). It has also been held that a multiplicity of prior actions is not a prerequisite to the issuance of an injunction where the prior litigation has been unusually protracted or burdensome, and the losing party simply refuses to be bound by the outcome. *Browning Debenture Holders' Committee v. Dasa Co.*, 454 F.Supp. 88 (S.D.N.Y.1978).

In commenting on the issuance of such injunctions, Professor Moore states:

> The usual procedural method for implementing the res judicata effect of a prior judgment is an appropriate plea or motion in the subsequent proceeding in which an attempt is made to relitigate the matter which is claimed to have been adjudged. Various factors, however, can render this method inadequate to prevent relitigation... The initial litigation may have been long, complex and costly, and the triumphant party can be put to great additional expense by the necessity of litigating a complex issue of res judicata before a tribunal unfamiliar with the record of the previous action.

> \* \* \* \* \* \*

> For these reasons, the practice has developed of enforcing the res judicata effect of a judgment in appropriate situations by the equitable remedy of injunction—a remedy historically available for such purposes as restraining vexatious or harassing litigation, restraining enforce-

---

7. In fact, it is charged that in some communities the pollution problems have worsened, including raw sewage in citizens' houses, because of the surcharging of their separated sewers by Allen Park's unitary sewers.

8. 28 U.S.C. § 1651(a) provides, "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

ment of inequitable judgments, and protection of previously acquired exclusive in rem or quasi in rem jurisdiction (footnotes omitted).

1B J. Moore, Moore's Federal Practice ¶ 0.408[2] (1983).

■ The typical justifications put forth for the issuance of such injunctions are principally economic. In this respect, it has been stated:

> The interests of repose, finality of judgments, protection of defendants from unwarranted harassment, and concern for maintaining order in the court's dockets have been deemed sufficient by a number of courts to warrant such a prohibition against relitigation of claims. *See e.g., Lacks v. Fahmi*, 623 F.2d 254 (2d Cir.1980) (per curiam); *Harrelson v. United States*, 613 F.2d 114, 115 (5th Cir.1980) (per curiam); *Clinton v. United States*, 297 F.2d 899, 901 (9th Cir. 1961), *cert. denied*, 369 U.S. 856, 82 S.Ct. 944, 8 L.Ed.2d 14 (1962).

*In Re Oliver*, 682 F.2d 443, 445 (3d Cir. 1982). Thus, it is recognized that, while traditional application of res judicata and collateral estoppel may be sufficient to protect a prevailing party so far as the legalities of the decision are concerned, injunction is appropriate, in certain circumstances, to protect a prevailing party from the expense of relitigation.

Here the justification for enjoining further litigation is even more compelling. Funding for the improvements mandated by the June, 1980 order and judgment is to be provided by the issuance of municipal bonds. However, that bond issue cannot take place so long as the cloud of litigation hangs over the matter. Thus, so long as there are matters before this court or on appeal, the entire project is effectively stalled. In more typical cases the courts can refuse to order a stay if collateral matters or appeals appear to lack merit. Here the parties can effectively issue their own *de facto* stay; as long as litigation persists, nothing moves. Allen Park is apparently very much aware of this fact. When the U.S. Supreme Court denied certiorari and effectively ordered Allen Park

to proceed with construction, the then Mayor of Allen Park stated, "This is just one battle in the war.... *As long as there's a lawsuit, a shovel won't touch the ground* .... We didn't put all of our eggs in one basket," (emphasis added). Detroit Free Press, Apr. 20, 1982, Metro Final Ed. at Section A, p. 3, Col. 7.

Allen Park cannot be allowed to indefinitely delay the implementation of the June, 1980 order and judgment by holding their "eggs" in many baskets and doling them out, one by one, in an endless procession of legal proceedings. Michigan's courts have faced the problems of delay which can arise in cases involving municipal bond-funded projects. In *Bigger v. Pontiac*, 390 Mich. 1, 210 N.W.2d 1 (1973), the Michigan Supreme Court was faced with a situation where the parties delayed for several months in bringing action in a case involving a bond-funded project. The Court held that, in cases such as that, courts may refuse to entertain legal matters which are not brought before the courts promptly. In so holding, the court stated:

> If we did not grant bypass and enter a final order, plaintiffs would obtain by the mere lapse of time the relief which they have been denied by the circuit judge as the continuation of this litigation would prevent delivery of the bonds.

*Id.* at 5, 210 N.W.2d 1. In a similar case, the Michigan Court of Appeals stated:

> We are aware that, but for a *Bigger* rule, projects duly adopted by elected government officials could be delayed and frustrated virtually indefinitely by artful applications of various phases of the judicial process.

*Langs v. Pontiac*, 96 Mich.App. 639, 642, 293 N.W.2d 659 (1980).

■ In this case we have the typical justification for imposing an injunction upon further litigation: the complex and protracted litigation and relitigation of a matter and the economic costs related thereto. Additionally, we have the situation in which the parties are aware that any litigation whatsoever can indefinitely

thwart progress of the project. In such a case an injunction on further litigation is particularly appropriate. Absent such injunction, the extent of delay which can be imposed by a party is limited only by the ingenuity of its lawyers and the depth of its pockets. The courts cannot be made to dance like puppets while a recalcitrant party pulls the strings. The time has come to get on with the business of ridding the Ecorse Creek Drain Basin of a public health hazard which has already been permitted to persist for far too long.

A number of additional motions have been filed requesting the imposition of civil contempt, criminal contempt, and costs on Allen Park and its privies. These motions will be held in abeyance in order to allow the affected parties an opportunity to comply with the direction of this decision.

An appropriate order has been entered.