STATE OF MICHIGAN (90–1902); United States Environmental Protection Agency (90–1901), Plaintiffs–Appellants,

v.

The CITY OF ALLEN PARK, et al., Defendants–Appellees.

Nos. 90–1901, 90–1902.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 18, 1991.

Decided Jan. 27, 1992.

Carl Strass, Martin W. Matzen, M. Alice Thurston, Ellen J. Durkee (argued & briefed), Albert M. Ferlo, Jr., U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for E.P.A.

Michael H. Feiler (argued & briefed), Farmington Hills, Mich., Kenneth D. Kruse (briefed), Allen Park, Mich., for The City of Allen Park.

Robert P. Tiplady, Sempliner, Thomas, Boak & Smith, Plymouth, Mich., for The Le Blanc Tile Drainage Dist., The Drainage District for Ecorse Creek Pollution Abate-

ment Drain No. 1 and Charles N. Young-blood.

Thomas A. Neenan (argued), Asst. Corporate Counsel, Detroit, Mich., for The County of Wayne.

A. Michael Leffler, John C. Scherbarth, Asst. Atty. Gen. (argued & briefed), Office of the Atty. Gen. of Mich., Lansing, Mich., for State of Mich.

Before JONES and MILBURN, Circuit Judges, and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

This case involves the relationship between Titles II and III of the Federal Water Pollution Prevention and Control Act of 1972 (the Act), 33 U.S.C. §§ 1251 et seq. The question we must decide is whether the district court correctly ordered the United States Environmental Protection Agency (EPA) and the Michigan Department of Natural Resources (MDNR) to fund 80% of a Sewer System Evaluation Survey (SSES) to be undertaken by the City of Allen Park, Michigan. Along the way we must determine whether the parties and the district court used the term "project" as a description of the entire effort by Allen Park to reconstruct its waste water treatment and disposal system to prevent pollution of the Ecorse Creek, or as a more restricted description of a single phase of the entire reconstruction.

## I.

Title II of the Act, 33 U.S.C. §§ 1281–1299, authorizes federal grants for local waste water treatment works. Title III, 33 U.S.C. §§ 1311–1328, establishes pollutant limitations and authorizes EPA to enforce the statutory water quality standards. Each year EPA allots by formula to each state federal funds to be granted via Title II for waste treatment works. Each state establishes priorities for the year among applicants within the state and furnishes EPA with a ranked list of recipients for the allotted funds. A subchapter of EPA's regulations known as the "Grants for Construction of Treatment Works" program controls the funding of projects. 40 C.F.R.

§§ 35.900–35.970 (1991).[1] The operation of the grant program has been described authoritatively as follows:

Projects for waste treatment works are divided into three steps. Step 1 is the planning phase in which the overall facility plan for the project is developed. This involves consideration of alternatives, the determination of the size and scope of the project, and development of other required information to enable the actual design work to begin. This design work, in which construction drawings and specifications are prepared, is Step 2. Step 3 is the actual construction.

Municipal Wastewater Treatment Construction Grant Amendments of 1981, H.R.Rep. No. 270, 97th Cong., 1st Sess., at 4, *reprinted in* 1981 U.S.Code Cong. & Admin.News at 2629, 2632. See also 40 C.F.R. § 35.920–3.

Allen Park's relationship with EPA and MDNR in connection with the pollution problems of Ecorse Creek began in the early 1970s. Under then current regulations EPA funded "projects" for approved grants, which were defined as "[t]he scope of work for which Federal Assistance is awarded by a grant or grant amendment." 40 C.F.R. § 35.905–16 (1975). Project changes that substantially altered "the objective or scope of the project" or "changed the amount of assistance provided by the grant agreement" required a formal grant amendment. 40 C.F.R. § 35.935–11 (1975). The approval of any one Step 1, 2, or 3 project or grant award did not commit EPA to approval for subsequent projects. 40 C.F.R. § 35.903(m) (1975).

On December 29, 1981, Congress amended Title II of the Act by adding section 201(*l*)(1), which effectively prohibits EPA from awarding Step 1 or 2 grant money. Municipal Wastewater Treatment Construction Grant Amendments of 1981, Pub.L. No. 97–117, 33 U.S.C. 1281(*l*)(1). Section 201(*l*)(1) provides:

After December 29, 1981, Federal grants shall not be made for the purpose of providing assistance solely for facility plans, or plans, specifications, and estimates for any proposed project for the construction of a treatment works. In the event that the proposed project receives a grant under this section for construction, the Administrator shall make an allowance in such grant for non-Federal funds expended during the facility planning and advanced engineering and design phase at the prevailing Federal share under section 1282(a) of this title, based on the percentage of total project costs which the Administrator determines is the general experience for such projects.

## II.

In May 1969 the Michigan Water Resources Commission (MWRC) began a study of the water quality of the North Branch of Ecorse Creek which flows through several cities near Detroit, including Dearborn Heights, Lincoln Park, Taylor, and appellee Allen Park. The MWRC study revealed that rainfall of less than one inch would cause unacceptable amounts of domestic sanitary sewage and storm water runoff to be discharged into the creek at two outfalls that were fed by the cities' sewer systems. In 1970, after the release of the water quality study, MDNR ordered the communities polluting Ecorse Creek to stop the flow of waste into the water. See generally *State of Michigan v. City of Allen Park*, 501 F.Supp. 1007, 1009 (E.D.Mich.1980) (*Allen Park I*).[2]

In 1974 Wayne County Drain Commissioner Charles Youngblood obtained a Step 1 planning grant from EPA to be used for: the evaluation of existing sewer systems, the study of alternative treatment works, preparation of the environmental assessment, and the determination of the most

---

**1.** The 1991 edition of the Code of Federal Regulations accurately reflects the regulations in force during the period in dispute. When specific earlier regulations, no longer in force, are cited the C.F.R. section or sections for that year will be noted.

**2.** In addition to numerous unpublished orders, the district court filed three opinions and orders that are published in Federal Supplement. We refer to them as *Allen Park I, II, and III.*

cost-effective waste treatment management system that will meet water quality standards and abate pollution presently caused within the Ecorse Creek Basin.

The original "Project Scope" for the grant was merely described as "the preparation of a Facilities Plan in accordance with 40 C.F.R. § 35.917, Facility Planning, for the Ecorse Creek Drain Improvement Drainage District." EPA's grant award letter to Commissioner Youngblood cautioned:

it should be clearly understood when the infiltration/inflow analysis task of the facility plan is completed it must be approved by this Agency before any subsequent sewer system evaluation work is undertaken, if the costs of such future work are to be eligible for grant consideration.

After completing his study, Commissioner Youngblood offered three alternative solutions to bring the four cities into compliance with the MDNR order. A report referred to as *Element 2* recommended implementation of Alternative 1, which required the cities to construct new sewer systems to separate sanitary sewage from storm runoff. The Wayne County Drainage Board formally selected Alternative 1 in January 1977.

Commissioner Youngblood then procured a Step 2 grant for *Element 2* from MDNR and EPA. The Project Scope of the grant encompassed:

that portion of the preparation of plans and specifications for the multipurpose facilities listed below, which relates to the pollution control function as determined by the Alternative Justifiable Expenditures (AJE) method of cost allocation, all in accordance with [*Element 2*]. That portion of the multipurpose project which relates to improvement of the surface drainage is specifically excluded from the eligible project scope.

The Step 2 Grant Conditions included the following:

3. That in accordance with 40 CFR 35.-903(m), the award of grant assistance for this project does not constitute a Federal commitment for approval of grant assistance for any subsequent project.

4. That inasmuch as approval of 40 CFR 35.925–1 facilities planning requirements prerequisite to this award is pursuant to 40 CFR 35.917(d) and further, since this award is pursuant to 40 CFR 35.927–5(c), "Exception," the grantee agrees (1) to complete the sewer system evaluation survey and any resulting rehabilitation, (2) to complete the remaining facilities planning tasks in accordance with the implementation schedules contained in the tandem Step 1 grant, Project Number C262436 01, which schedules are hereby incorporated by reference, and (3) supplement and/or amend the completed facilities planning tasks as needed consistent therewith.

At the urging of the four cities, Commissioner Youngblood approved implementation of Alternative 1 as the most cost-effective and environmentally beneficial of the proposed solutions. The Allen Park city council also passed a resolution that approved financing for its portion of the project.

That same year EPA and MDNR approved Alternative 1 and tendered Step 3 construction grants under the Act whereby EPA would pay 75% and MDNR would pay 5% of the cost for construction of the sewer separation project, with the remaining 20% being divided among the communities served by the project. *Allen Park III*, 739 F.Supp. 1102, 1104 (E.D.Mich.1990). The Step 3 grant's condition 4 was identical to condition 4 of the Step 2 grant. The drainage permit issued pursuant to the Act required completion of facilities to prevent combined sewer overflows by March 31, 1982.

### III.

In 1978 the Drainage Board apportioned the financial burden among the four cities. After contractors' bids were received, Allen Park's share of the cost was estimated at more than $10 million, payable in installments through the year 2003. Believing it had been assigned too large a share of the cost, Allen Park filed suit against various county administrative agencies seeking an injunction against the project. The parties

settled the suit by dividing the project into two segments: one covering Allen Park's sewer separation, sanitary retention facilities and pumping facilities (contracts 1–5 and 13); and one covering sewer separation and storm water control in the other three cities (contracts 6–12).

### A.

The other three cities substantially completed construction under contracts 6–12 by mid–1980. *Allen Park I*, 501 F.Supp. at 1011. However, Allen Park fell behind. Contractors who had submitted the lowest bids for certain Allen Park contracts filed "citizen suits" (33 U.S.C. § 1365(a)) seeking an order that would require Allen Park to proceed with construction according to schedule because the Step 3 grants would remain "earmarked" only until March 1, 1980. Defendants named included Allen Park, various Wayne County entities involved in drainage matters, EPA and MDNR. Eventually EPA and MDNR were realigned as plaintiffs. After full consideration the district court entered an interim order and a final order, and retained jurisdiction for the purpose of implementation. In its opinion the district court found that the plaintiffs had demonstrated a need for the court to "compel[ ] financing and construction" by Allen Park, and rejected all of Allen Park's counterclaims, including its argument that EPA should not have awarded the Step 2 grant until it produced an environmental impact statement. *Allen Park I*, 501 F.Supp. at 1018. The final order, entered July 1, 1980, directed Allen Park to "proceed forthwith" to fund and construct the "Element II Facilities Plan." This court affirmed the district court without an opinion, 667 F.2d 1028 (6th Cir.1981), and the Supreme Court denied certiorari, 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 443 (1982).

After further legal sparring that produced district court orders directing Allen Park to comply with particular construction steps, in 1983 EPA and MDNR filed a motion requesting the district court to set a compliance schedule, complaining that Allen Park had not complied with the 1980 final order. The district court granted the motion and, in effect, adopted the timetable proposed by the agencies. This 1983 order did not impose any duties on the agencies other than to review and make decisions on Allen Park's project, contract and grant applications.

Meanwhile Allen Park had commissioned and circulated to interested agencies a study by an independent engineering firm which advised that Alternative 1 was not the most cost-effective solution to the city's drainage problem and offered several alternatives. On petition of EPA the district court conducted a hearing and issued an order that "any alternative considered must lead to at least equal pollution abatement, be less costly and be able to be implemented within the same time." *Allen Park II*, 573 F.Supp. 1481, 1484 (E.D.Mich. 1983). Advised that EPA continued to advocate completion of Alternative 1 and could not guarantee funding even for suggested alternatives that might be more cost effective, the district court held that Allen Park had not demonstrated a reason for abandoning Alternative 1 or for reevaluating *Element 2*. In denying Allen Park's petition for modification, the court observed:

> This is not simply a case where justice, for its own sake, should be delayed.

> \* \* \* \* \* \*

> A known health hazard has been permitted to exist for over 13 years while various administrative and judicial proceedings interminably ground along their way. Now we have at hand a solution to the problem which all parties agree will help alleviate the problem. We have state and federal funding for the project. We have all the communities involved, with the exception of Allen Park.

*Id.* at 1486. The district court also issued an order enjoining all parties from instituting further litigation or carrying on any administrative proceedings that would prevent or delay fulfilling the requirements of the 1980 orders or its 1983 compliance schedule.

### B.

In March 1985 Commissioner Youngblood applied for a Step 1 grant amendment to cover the cost of SSESs for Lincoln Park and Allen Park, plus the cost of Allen Park's independent engineering study. Allen Park had not performed an SSES, but the Lincoln Park SSES was nearing completion. MDNR agreed to review and determine grant eligibility for the Lincoln Park SSES, but declined to take action on Allen Park's request. The agency explained that Lincoln Park had accepted its SSES in time for the project "to be ranked on the FY'84 project priority list update," whereas Allen Park was not eligible for a Step 1 grant amendment. Youngblood tried again on behalf of Allen Park in 1987, seeking an increase in the Step 1 grant from MDNR to conduct Allen Park's SSES. MDNR replied that a Step 1 grant amendment to fund the SSES was not possible "[a]lthough our office notified your office and consulting engineer that the review and approval of the SSES contract was not necessary and would not impact on subsequent grant funding." MDNR then advised:

As in the case for Lincoln Park, the cost to perform the SSES could be funded through a Step 2 allowance based on a future project eligible for a Step 3 grant. We are precluded from funding the SSES as a Step 1 grant amendment by the 1981 Amendments to the Clean Water Act; State Construction Management Plan of 1982 and the Federal Guidance Memorandum of September 27, 1985. *The 1981 Amendments to the Clean Water Act* eliminated future funding of Step 1 and Step 2 grants. *The Construction Management Plan of 1982* precluded increasing the scope of a Step 1 and Step 2 grant, except when subsequent Step 2 + 3[3] or Step 3 grant funding is projected within the next three allotments.

The MDNR letter quoted a September 27, 1985, *Federal Guidance Memorandum*

on management of Step 1 and Step 2 grants as follows:

Step 1 or Step 2 projects which are physically complete may not be "re-opened" via a grant amendment for any reason.

The letter continued:

The Allen Park portion of the Ecorse Creek Project is physically complete and is thus out of the realm for a grant amendment.

In summary, the responsibility for conducting the SSES and recommending rehabilitation for Allen Park remains with the County. The State will review a Step 3 Application for approval upon receipt and when grant funds may be available.

Seeking administrative review of MDNR's decision by EPA, the Drainage Board argued that the SSES was part of the original Step 1 grant award and that the sewer separation could not be complete as MDNR held it was, if a remaining grant condition—the SSES—was incomplete. The Board, relying on a 1982 "Interim Final Regulation," contended that section 201($l$)(1) (the 1981 amendment) should not be applied retroactively to this request, asserting that the Step 1 grant was awarded before the amendment. Finally, the Board argued that section 201($l$)(1) was enacted to stop grant funding for planning proposed projects and was therefore not applicable to the Allen Park SSES because it was not a planning study. (An SSES is usually performed during the Step 1 (or "planning") stage of a proposed sewer project on an existing sewer system in order to determine what will be required to bring the system into compliance with state and federal regulations. *Element 2*, however, recommended that SSESs be performed for Allen Park and Lincoln Park after separate construction was completed and all parties accepted this recommendation.)

EPA's response forecast the agency's position in the district court and in this court on appeal:

cap of three million dollars for construction costs. See 40 C.F.R. § 35.903(b) (1979); 40 C.F.R. § 35.909 (1991).

---

**3.** Step 2 + 3 grants became available in 1978 after the grants for *Element 2* were awarded. Step 2 + 3 grants would not suit the Alternative 1 sewer separation because the grants have a

We do not agree that the SSES is part of the Step 1 project nearing completion. Rather, we conclude the grant amendment represents a continuation of an existing grant, already awarded. The key word in this element of the issue is "project," which is defined in [40 C.F.R. §§ 35.905–16, 35.930–4]. The scope of the project as defined in the grant amendment does not include an SSES for the City of Allen Park, and, therefore, is not part of the existing Step 1 project.

Referring to its policy following enactment of section 201(*l*)(1), EPA stated:

This policy provided for awarding grant amendments to active Step 1 and Step 2 projects to complete *existing* works scopes, provided the administrative completion of the project would not exceed FY 1987—September 30, 1987. Physically complete projects could not be reopened for any reason.

EPA conceded that "the original intent of all parties was to conduct the SSES after the initial sewer separation and retention basin construction," but then found that they were not applying Section 201(*l*)(1) retroactively because the definition of "project" remained the same from the time the Drainage Board received the Step 1 grant until 1987 and the SSES was not part of the original Step 1 project grant. EPA also determined that nothing in the district court's 1980 interim or final orders nor the 1983 injunction precluded them from denying the grant amendment because the earlier orders only addressed Step 2 and Step 3 grants. EPA concluded:

[t]he facts irrefutably establish that the scope of work for the Allen Park SSES was not included in the original Step 1 Grant project C262436 01 or any of the subsequent amendments. It is also clear that the District's attempt to have the Allen Park SSES included via amendment occurred substantially after the enactment of the 1981 Amendments to the Act which precluded funding new Step 1 and Step 2 projects. While the impacts of the 1981 amendments to the Act could not have been foreseen, in order to receive Step 3 grant C262436 03, the District provided the requisite assurances

and agreed to perform the SSES and any subsequent rehabilitation as required by 40 CFR 35.927–5(c), which was incorporated into the grant as Special Condition No. 4. The Special Condition carried no promise or guarantee of future funding.

EPA indicated that this decision was based on section 201(*l*)(1) and the *Federal Guidance Memorandum* and constituted final agency action.

### C.

Allen Park filed a motion in the district court under the All Writs Act, 28 U.S.C. § 1651, for "Enforcement of Judgment to Compel Funding" of the SSES. In its memorandum in support, Allen Park maintained that "[d]uring the entire trial proceedings, the USEPA and MDNR represented to this Court that *The Project* would be grant funded and that, in fact, a Step 3 grant was already in place for this Project;" that the court and Allen Park had relied on this representation; that "[t]here was no dispute that the project sought [by the agencies] to be mandated would be fully grant funded;" and that *Element 2* always provided for an SSES in Allen Park. Finally, Allen Park argued that further appeals of the EPA's decision through the administrative process would be "fruitless." As support for the argument that the district court's 1980 and 1983 orders required the MDNR and EPA to provide grant funding, Allen Park cited MDNR official Paul Zugger's statement at a recent compliance conference with the district judge that the SSES was necessary for compliance and was part of the court-ordered project.

In response, MDNR argued that the district court's 1980 final order only addressed the Step 3 grant and that the 1983 order setting a schedule of compliance only addressed the Steps 2 and 3 grants. MDNR also argued that Allen Park's failure to exhaust administrative remedies precluded court action on the motion. Finally, MDNR maintained that the court was without the authority to grant relief under *United States v. City of Detroit*, 720 F.2d 443 (6th Cir.1983), in which we held that a

district court has no power to overrule EPA and MDNR's allocation and reallocation of funds under the Act. EPA and MDNR added that Section 201($l$)(1) precluded funding for SSES work. *Allen Park III*, 739 F.Supp. at 1106. The agencies also filed a motion to terminate Judge Feikens' earlier orders, explaining that the parties had completely performed them.

EPA reiterated MDNR's arguments and added that its decision not to fund the SSES should be afforded great deference by the district court.

### D.

While reserving a final decision until MDNR could file a supplemental memorandum, Judge Feikens made statements at the hearing that indicated an inclination to grant Allen Park's motion:

> I never heard at any time that the regulatory agencies ... raised the point that they would not come through with the requisite grants that were contemplated to do this. That, it seemed to me, was part and parcel of the whole project.
>
> \* \* \* \* \* \*
>
> In the Allen Park case, I ordered Allen Park to separate its sewers. I did so on the implicit understanding that grant funding would enable Allen Park to do it.
>
> \* \* \* \* \* \*
>
> I don't want to be misunderstood. I don't think I have any power to order something to be done in the future. I have no power to levy taxes. I don't have any power to provide for these funds. I'm approaching this on the basis that this was a part of the original undertaking and that what I'm asked to do here by Allen Park and Wayne County is enforce what was the understanding at that time. And in simplified terms, it was that the SSES study would come after sewers had been separated and would be funded.
>
> Now, if I'm wrong on that in the history of this case, then I would be wrong in entering that order, but if I'm right on that—

In its supplementary response MDNR conceded that the district court might have the authority to decide the questions raised by the motion, but contended that it had no power to order the payment of grant funds. MDNR also argued that Allen Park had misconstrued the term "project," used to encompass all of its steps taken to comply with Title III of the Act, rather than in a more restricted sense of referring to a funded "project" under Title II. According to MDNR, the SSES did not become a "project" for Title II funding purposes until the 1985 grant amendment application was received. Allen Park replied that the sewer separation was an "ongoing project."

Judge Feikens issued a written opinion and order in which he traced the history of the proceedings between the parties and implied that he denied Allen Park's 1983 motion to modify the 1980 order at least in part because there would be funding for *Element 2* Alternative 1. *Allen Park III*, 739 F.Supp. at 1105. The court then found:

> The [*Element 2*] Plan had been introduced and relied on throughout the trial as a description of the work that both sides agreed needed to be completed. Included in the Plan that was ordered at the close of the trial was the Allen Park SSES.
>
> Until recently, MDNR and EPA represented to me and to the defendants that the project for which they sought implementation would be grant funded. Throughout the extensive proceedings, all parties understood that grant funding was a necessary and agreed-upon aspect of this case and was required for the success of the sewer separation project. This court, Allen Park, and Ecorse Abatement Drainage District all relied on MDNR and EPA's representations.

*Id.* at 1106. The court pointed to specific language in its 1983 opinion and order as evidence of the court's reliance on the availability of funds for the SSES and the applicability of the 1983 injunction to the agencies refusal to fund the SSES. *Allen Park II*, 573 F.Supp. at 1486 (" 'We have state and federal funding for the project,' "; "any party [was enjoined] from

instituting any litigation or administrative proceedings that sought or had the effect of withdrawing grants or grant contracts").

The court held that its "prior orders and judgments in this case encompassed the grant funding by MDNR and EPA of the Allen Park SSES" and that the court's equitable powers extended to enforce its previous orders which had been "thwarted." *Id.* The court found that the agencies' approval of the decision to delay the SSES until after construction prevented them from now arguing that they would not grant money for a completed project. *Id.* Finally, the court did not determine whether section 201($l$)(1) "actually prohibits the funding of an SSES as EPA claims" but held that section 201($l$)(1) was not applicable to the Allen Park SSES because the court's 1980 opinion and order predated the 1981 amendment and the amendment was not given retroactive effect. *Id.* at 1107. Finally, the court denied the agencies' motion to terminate the earlier orders, and retained jurisdiction. *Id.* This appeal followed.

### IV.

The arguments on behalf of the appellants EPA and MDNR emphasize the meaning of "project" under the Act, the distinctions between the "Steps" and the fact that the Act does not condition compliance with water quality standards mandated in Title III upon the availability of grant funds under Title II.

### A.

The appellants assert that "project" has a technical meaning under the Act. "Project" refers to the undertakings covered by a particular grant and each Step grant (or grant application) defines a discrete project. They contend that the entire program for eliminating pollution of Ecorse Creek by controlling waste water from the four cities was not a "project" within the meaning of the Act. On the other hand, the SSES requirement that each city was required to obtain was necessarily a Step 1 project, since it involved planning, or perhaps a Step 2 project, involving design work.

The appellants' argument continues that the original Step 1 and 2 grants for the four cities did not identify funds for the SSESs, because it was agreed that more could be achieved by deferring these studies until the sewer separation facilities construction was completed or near completion. The other three cities reached that point on schedule, and then filed amended Step 1 requests for grants to fund the surveys. Because Allen Park did not proceed with the construction of its facilities as promptly as required by the district court, but sought to avoid its obligations, the district court finally issued its injunctive order of 1983. When Allen Park reached the point where it required an SSES to complete its compliance with Title III requirements, it sought to amend its Step 1 grant application to obtain funds for the SSES. By that time, however, Congress had amended the Act to provide that no grants could be made to fund Step 1 or 2 projects.

Thus, EPA and MDNR argue, any reference by the parties or the court to the entire Ecorse Creek cleanup program as the "project" was a non-technical description that could not override the operation of the Act as prescribed by Congress. The SSES project could not be funded through the Step 3 grant, which was limited to actual construction of facilities, and it was too late to fund it through an amended Step 1 or 2 grant. Thus, they contend, the district court exceeded its authority by ordering the appellants to fund Allen Park's SSES in 1990. No previous order of the court had ever "encompassed" funding for the SSES, and EPA and MDNR did not violate the district court's 1983 order by denying grant funding.

Finally, the appellants contend that this was an enforcement action against Allen Park pursuant to Title III of the Act; it does not concern the grant provisions of Title II. They argue that the statutory scheme devised by Congress does not provide for a court order compelling EPA to grant funds pursuant to Title II. The Act

vests authority in EPA to administer Title II grants, and the district court order violates the separation of powers doctrine. They assert that the All Writs Act provides no basis for the order directing the appellants to fund Allen Park's SSES. Because the district court had no jurisdiction to order the grant of funds, the All Writs Act could not be invoked; it may be used by a court only in aid of jurisdiction already acquired on some other basis.

MDNR also contends that the district court should not have considered the issue of grant funding for the SSES because Allen Park failed to exhaust administrative remedies available to it under the 1972 Act.

#### B.

Allen Park argues that the district court did not exceed its authority. Its 1990 order did not compel EPA and MDNR to make grants, but required them to provide funding for grants they had previously made. Both the 1980 and 1983 orders compelled Allen Park to take certain actions to remedy pollution and drainage problems affecting Ecorse Creek, and the 1990 order merely enforced compliance with the earlier orders. Allen Park maintains that it was required to provide an SSES under these court orders, and that it was understood from the beginning that the "project" would be fully grant funded. The "project," according to Allen Park, included all phases of the four cities' remedial actions required to achieve the water quality standards for Ecorse Creek.

Because the SSES activities, although part of the planning process, were deferred until the sewer separation was completed, Allen Park argues, funding for these studies was necessarily included in the Step 1 grant commitment. EPA and MDNR consented to deferring the SSESs until completion, and cannot be heard to claim that they were never included in the grant commitments. For more than ten years all parties agreed that the entire "project" would receive 80% grant funding, and the district court entered its 1980 and 1983 orders on that understanding.

The 1981 amendment to the Act, section 201($l$)(1), provides that it does not apply retroactively. The appellants are arguing for retroactive application, according to Allen Park, by relying on the amendment as a bar to funding the SSES. This would be a retroactive application because the SSES was part of the "project" from the beginning. The district court did not seek to compel EPA and MDNR to provide new funding for the SSES, according to Allen Park. The 1990 order merely directed them to carry out the terms of their prior commitment. Because it did not compel funding of a new grant, the district court's order did not implicate section 201($l$)(1) at all.

Allen Park also argues that under the All Writs Act the district court had authority to compel compliance with its prior orders, which were based on the parties' and court's understanding of the appellants' funding commitments. Furthermore, the city contends, the district court could rely on judicial estoppel to prevent EPA and MDNR from refusing to honor their previous commitments to fund the SSES through grants as they had other phases of the "project."

#### V.

This litigation commenced with a complaint filed December 12, 1979, by four contractors who were low bidders for the sewer separation required under Alternative 1 of *Element 2.* Allen Park, various Wayne County entities concerned with drainage, EPA, and MDNR were named defendants. The complaint stated that although EPA and MDNR had tendered Step 3 grants for the necessary construction work, Allen Park refused to participate in the "project" and had attempted to interfere with its effectuation. The funds were earmarked only until March 1, 1980, and the plaintiffs sought an order requiring Allen Park to award contracts in accordance with the low bids and requiring EPA and MDNR to provide the funds for construction under contracts 1 through 5.

### A.

The district court considered the case on an expedited basis. After a non-jury trial the court issued its interim order on May 16, 1980. That order required the Wayne County Drain Commissioner to obtain and furnish to the court and counsel an independent estimate of the cost of contracts 1 through 5. The order also required EPA and MDNR to review the independent estimates and decide whether to award grants on contracts 1 through 5 as bid or to reject the bids. It also required the appropriate parties to take all steps necessary for a bond issue to fund Allen Park's portion of "the element II plan." Finally, it directed the drain commissioner to relocate and redesign, as required, contract 13, the retention facility portion of the *Element 2* plan.

The final order, dated June 30, 1980, further implemented the interim order and directed the drainage authorities "forthwith to fund and construct the Element II Facilities Plan Alternative 1, in its entirety," including contracts 1 through 5 and a retention basin that became contract 13. It directed these parties to apportion the costs and directed Allen Park to provide funds each year as necessary to meet its share, by a special tax or otherwise. The court retained jurisdiction "for the purpose of implementing the judgment."

The district court filed an opinion, *Allen Park I*, in which it concluded that it had jurisdiction under section 505(a) of the Act, 33 U.S.C. § 1365(a) which provides for citizen suits, and 28 U.S.C. § 1331, the general "federal question" provision. 501 F.Supp. at 1012. In its opinion the court concluded that failure of the drainage authorities and Allen Park to undertake the necessary actions to comply with the construction schedule contained in the permit constituted a violation of section 301(a) of the Act, 33 U.S.C. § 1311(a), and of the Michigan Water Resources Commission Act, M.C.L. § 323.7(1). The opinion concluded as follows:

> Because of Allen Park's refusal to proceed with financing its segment of the project, plaintiffs are entitled to injunctive relief compelling financing and construction of the Allen Park segment of the Element 2 Final Plan, a project determined necessary for the public health.

501 F.Supp. at 1024. As with the orders, the opinion contained no specific direction concerning grant funding by EPA or MDNR.

### B.

The 1983 order was entered on February 15 in response to a motion by the plaintiff contractors requesting the court to set a compliance schedule with respect to its previous orders and judgment. The 1983 order directed the defendant county and district drainage authorities to comply with the 1980 interim and final order in accordance with a schedule set forth. Part III of the order dealt with "Financing, Grant Administration and Construction" and directed the Drainage Board to approve the assessment rolls and estimates of costs "for the court-ordered project" by March 16, 1983. It set a timetable for the various steps related to financing construction. Paragraphs I and J are pertinent to this dispute:

> I. The MDNR shall approve or disapprove the Step 3 grant amendment request by December 12, 1983.
>
> J. The U.S. EPA shall approve or disapprove the Step 3 grant amendment request by January 6, 1984.

Upon motions for injunction and for orders to require Allen Park to show cause why it should not be held in contempt for its failure to comply with the requirements of the 1980 final order for payment of its share of the costs of the pollution abatement of Ecorse Creek, the district court ordered the city to pay the Drainage District no later than October 11, 1983. The order, dated October 3, 1983, then enjoined all parties from "instituting, appearing in or carrying on any litigation or any administrative proceedings ...

> A. which will have the effect of preventing or delaying any of the parties or their officers, agents, attorneys or employees from fully carrying out and complying with this court's June 30, 1980 Final Order and Judgment and

this court's February 15, 1983 compliance schedule as both presently exist; and

B. which seeks to or has the effect of withdrawing grants or grant contracts for the project which is the subject matter of this litigation, or which seeks to rearrange grant priorities, demand an environmental impact statement, demand rebidding of the construction contracts, seeks to block site locations or seeks to block sewer use or sewer connection, other than as provided in the February 15, 1983 compliance schedule[ ].

The order further enjoined all parties from refusing to carry out the Court's 1980 final order and 1983 compliance schedule, and "from otherwise challenging the project or seeking to block it." The district court filed an opinion covering its 1983 orders on November 2, 1983. *Allen Park II,* 573 F.Supp. at 1481.

### C.

On January 8, 1990, the Drainage District and Allen Park filed a motion to compel EPA and MDNR to provide funding "for completion of the Allen Park SSES work." The motion was made pursuant to the All Writs Act and relied specifically on the 1980 final order, the 1983 order setting the compliance schedule, and the October 3, 1983 injunction order. MDNR responded that the orders referred to did not involve the Step 1 (facilities planning) grant, but referred only to Step 3 construction grants and Step 2 design grants. The response also questioned the court's jurisdiction to grant the requested relief. EPA's response was a motion to terminate all previous orders and for dismissal of the consolidated action on the ground that all parties had complied with the provisions of the orders. In an accompanying memorandum, EPA argued that no previous order of the district court required state or federal funding of Allen Park's SSES, that section 201(*l*)(1) prohibited federal funding of the study, and that Sixth Circuit law precluded the district court from granting the requested relief.

After conducting a hearing, the court granted Allen Park's motion and denied EPA's motion to terminate its previous orders.

### VI.

 The district court viewed the record as supporting the conclusion that EPA and MDNR had guaranteed 80% grant funding for the entire sewer separation program involved in the four cities' required actions to relieve pollution of Ecorse Creek. This was the "project." Further, the court construed its earlier orders as being based upon this understanding. If two views of the evidence in a case are permissible, the choice between those views made by the fact finder is not clearly erroneous. *United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949). And an appellate court should accord deference to a district court's construction of its own earlier orders, if that construction is reasonable. *Commercial Union Ins. Co. v. Sepco Corp.,* 918 F.2d 920, 924 (11th Cir. 1990).

### A.

There are two permissible views of the evidence in this case. One view is that espoused by EPA and MDNR. According to this conception of the record, there was never an Ecorse Creek Project made up of several phases—planning, design and construction. Instead, each phase, encompassed by a step application, and if approved by a grant, was a discrete project. Thus, when the parties agreed to defer Allen Park's SSES it was not included in the original Step 1 grant. Because of Allen Park's delay in proceeding with design and construction after *Element 2* Alternative 1 was accepted, by the time it was ready to complete the SSES it was too late. Congress had amended the Act to provide that no federal funds would be provided for planning, specifications and estimates. Inasmuch as Allen Park was seeking funding for a component of planning, section 201(*l*)(1) prevented EPA from making the grant. Since it was the subject of a new

and separate grant request, the SSES was a separate "project." And the district court had no authority to order EPA or MDNR to fund a "project" that was forbidden by Congress.

 The other view, adopted by the district court, was that the entire Ecorse Creek pollution control effort involving the four cities was a "project." From the time the local authorities chose *Element 2* Alternative 1 and EPA and MDNR agreed to fund it, all parts of the "project" could go forward with the funding for which the local entities were responsible, limited to 20%. Thus, when the district court ordered Allen Park to proceed with completion of construction under Step 3, it did so on the understanding that all work necessary to complete the entire project would received 80% federal and state funding. The same understanding of the record underlay the court's injunctive order against withdrawing funding.

We believe the record supports the district court's view, and accordingly we will affirm the judgment. *Yellow Cab,* 338 U.S. at 342, 70 S.Ct. at 179; *Commercial Union Ins. Co.,* 918 F.2d at 924. The initial study in 1977 from which the sewer separation program evolved recommended as part of *Element 2* that SSESs be performed for Allen Park and Lincoln Park after separation construction was completed. This was contrary to the usual order in which such a program proceeded. Ordinarily the SSES was part of the Step 1 or "planning" stage in cases where a new sewer project was being imposed on an existing sewer system. The parties agreed to a delayed evaluation in this case because it was felt that this approach would maximize the usefulness and accuracy of the survey.

Thus, it was a peculiar feature of the approved plan that Allen Park was required to wait until sewer separation construction was completed before it could obtain the evaluative survey. Nevertheless, Alternative 1 required an SSES, and Allen Park would never be in compliance until the survey was made. The plan adopted by the drainage authorities and approved by

EPA and MDNR clearly required all four cities to complete SSESs to satisfy their obligations. Under the district court's view of the evidence, it was always contemplated that, as an integral part of the program, there would be state and federal funding for the SSESs. In fact, the other three cities received such funding. EPA and MDNR turned down Allen Park's request, treating it as a Step 1 grant amendment that was precluded by section 201($l$)(1), stating, "The Allen Park portion of the Ecorse Creek Project is physically complete and is thus out of the realm for a grant amendment." Thus, in the very letter denying funding the appellants referred to the "Ecorse Creek Project." They did not use "project" in the limited, technical sense for which they now argue. This was just one of several clear indications that "project" was used throughout this case to refer to the entire undertaking by the four cities to alleviate the pollution of Ecorse Creek. In the Step 2 grant itself EPA referred to the "multipurpose project," clearly not a use of the word "project" as limited to a single phase of the undertaking. In addition, section 201($l$)(1), upon which EPA and MDNR place heavy reliance, uses "project" in the broad sense. It prohibits "providing assistance solely for facility plans, or plans, specifications, and estimates for any *proposed project* for the construction of a treatment works. In the event the *proposed project* receives a grant under this section for construction...." (emphasis added). Clearly, the statute refers to the entire program or undertaking as a "project," while discussing the various phases without designating them as "projects."

We have quoted Condition 4 of the Step 2 and Step 3 grants in the statement of facts. At best, this condition was ambiguous. The first requirement of this condition set the SSES aside from the rest of the planning tasks to be performed under Step 1 as set forth in the second requirement. It is certainly not apparent that this segregation meant that the SSES was not funded. Further, Condition 3 of the Step 3 grant mentioned that grant requests would be governed, inter alia, by 40 C.F.R. § 35.935–16

"sewer use ordinance and evaluation/rehabilitation program." It was perfectly reasonable for the district court to treat this language as doing nothing more than changing the timing of Allen Park's SSES, but recognizing that it had been funded along with the other tasks normally encompassed within Step 1 planning.

Given this understanding of the agreed-upon decision to delay completion of the SSES, the district court quite logically treated this requirement as having been included in the grant commitment for Step 1. Thus, its 1980 order and the 1983 injunction against any action "which seeks to or has the effect of withdrawing grants or grant contracts for the project which is the subject matter of this litigation" included funding for this SSES. Here, the court used "project" to refer to the entire "Ecorse Creek Project" just as MDNR had in its letter denying Allen Park's application for SSES grant funding. Although "project" has a technical meaning in the Act and regulations, we believe it is clear that throughout this litigation all parties and the court have referred to the entire undertaking by which the four cities sought to stop pollution of Ecorse Creek from their sanitary sewers and surface runoff as a single "project." This is graphically illustrated in MDNR's letter denying SSES funding, where the agency referred to "[t]he Allen Park portion of the Ecorse Creek Project."

Furthermore, the request for SSES funding was not a "project change" that substantially altered the objective or scope or changed the amount of assistance provided by a grant agreement. Such a project change requires a formal grant amendment. 40 C.F.R. § 35.935–11. When EPA and MDNR turned down Allen Park's request for SSES funding they had already approved Allen Park's Step 3 construction grant. Yet Allen Park's contribution to the Ecorse Creek Project would not be complete without an SSES. Under the district court's permissible view of the evidence, Allen Park merely sought payment of funds necessarily included in the earlier Step 1 grant, but for which disbursement had been delayed by agreement of the parties.

### B.

We do not believe that section 201($l$)(1), relied upon by EPA and MDNR, stands in the way of the district court's order. That section states that "[a]fter December 29, 1981, Federal grants shall not be made for the purpose of providing assistance solely for facility plans, or plans, specifications, and estimates for any proposed project for the construction of treatment works." EPA made a Step 1 grant to provide assistance for plans, specifications, etc., for this "proposed project" long before December 29, 1981. But for the agreement to defer completion of the SSES, actual grant funding would have occurred for the SSES along with that provided for the other Step 1 planning. The commitment for the grant was made in 1977 and the fact that a condition required deferral of completion of this particular phase of the planning portion of the project did not turn Allen Park's application for SSES funding into a request for a new grant.

The Supreme Court has held that "absent a clear indication to the contrary in the relevant statutes or legislative history, changes in the substantive standards governing federal grant programs do not alter obligations and liabilities arising under earlier grants." *Bennett v. New Jersey*, 470 U.S. 632, 641, 105 S.Ct. 1555, 1561, 84 L.Ed.2d 572 (1985). Section 201($l$)(1) was enacted primarily to reduce federal funding for municipal waste treatment facilities. Congress did this by eliminating federal grants for planning and design of future treatment works. There is nothing in the language of the statute or the legislative history that indicates an intent to give section 201($l$)(1) retroactive effect. It operated from December 29, 1981, forward.

Nor did EPA's 1985 policy implementing section 201($l$)(1) require it to deny grant funding for Allen Park's SSES. That policy prohibited additional funding for completed Step 1 work. By agreement of all parties, however, the Step 1 work for the

Ecorse Creek project had not been completed. It would not be completed until the SSES had been performed because the parties made that a condition. If the parties had not agreed to this deferral and Allen Park had merely failed to complete the SSES while performing other tasks required by the Step 1 grant, EPA's 1985 policy statement would apply, and denial of Allen Park's request would have been proper.

### C.

The appellants argue that the district court transgressed this court's ruling in *United States v. City of Detroit*, 720 F.2d 443 (6th Cir.1983), by directing EPA to fund this SSES. In *City of Detroit*, we held that a court may not order the allocation or payment of grant funds in a compliance action brought under Title III of the Act. This is so because Title II relating to federal grants and Title III relating to water quality requirements and their enforcement "are not mutually dependent." *Id.* at 451. One problem with this argument is that this case was not brought as a compliance action pursuant to 33 U.S.C. § 1319 by EPA. It was initiated as a "citizen suit" under section 505(a) of the Act, 33 U.S.C. § 1365(a), by contractors seeking to have their bids recognized by awards of contracts.

■ Even assuming that this case was converted into an enforcement action when EPA and MDNR were realigned as plaintiffs, we do not believe *City of Detroit* prevented the district court from ordering EPA and MDNR to carry out their previous commitments to fund 80% of Allen Park's sewer separation and treatment facility costs. In *City of Detroit* the district court attempted to change an appropriation made by EPA and require it to fund a future grant. In that case there was no indication that the parties had agreed to defer work normally included in a Step 1 grant to a later time. Thus, there was no basis in *City of Detroit*, as there is in this case, for treating the funds as having been reserved by agreement of the parties and a condition of the earlier grant.

■ EPA and MDNR also argue that the district court had no authority to issue the 1990 order in reliance on the All Writs Act, 28 U.S.C. § 1651. The appellants correctly note that a court must have an independent ground for jurisdiction when enforcing earlier orders under the All Writs Act. See *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34–35, 101 S.Ct. 188, 189–190, 66 L.Ed.2d 193 (1980); *Maczko v. Joyce*, 814 F.2d 308, 310 (6th Cir.1987), *cert. den.*, 484 U.S. 828, 108 S.Ct. 98, 98 L.Ed.2d 58 (1987); *Pennsylvania Bureau of Correction v. United States Marshals Service*, 474 U.S. 34, 40, 106 S.Ct. 355, 359, 88 L.Ed.2d 189 (1985):

> It is true that this Court consistently has construed the All Writs Act to authorize a federal court "to issue such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained."

(quoting *United States v. New York Telephone Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977)).

■ The original orders were issued in an action brought pursuant to the "citizen suit" provision, 33 U.S.C. § 1365(a), and throughout the proceedings the district court treated it as one based on that provision and on federal question jurisdiction conferred by 28 U.S.C. § 1331. The reason for not permitting a court to order funding in a 33 U.S.C. § 1319 compliance action is that the Act does not provide for judicial review of Title II grant decisions, which are discretionary. But see *Sarasota, Florida v. EPA*, 799 F.2d 674, 678 (11th Cir. 1986) ("we are certain that Congress did not intend to shield EPA Clean Water Act grant decisions from all judicial review"). Once the court found that EPA was committed to make this particular grant, its discretion had been exercised and was no longer involved. It was ordered to perform the nondiscretionary task of paying funds in accordance with its prior grant decision. The district court's jurisdiction to proceed under the All Writs Act was supported by two underlying jurisdictional bases. This

being so, the district court had a classic case for employing the All Writs Act "to effectuate and prevent the frustration of orders it ha[d] previously issued in its exercise of jurisdiction otherwise obtained." *Pennsylvania Bureau of Correction,* 474 U.S. at 40, 106 S.Ct. at 360.

### D.

■ Allen Park argues that the judgment of the district court should be affirmed on grounds of judicial estoppel. Although not necessary to our decision, we discuss this contention solely to make it clear that our decision does not rest on estoppel. Estoppel will seldom apply against the sovereign. Although the Supreme Court has never adopted a "flat rule" absolutely prohibiting estoppel against the government, it is clear that this equitable doctrine is very limited as a basis of government liability. See *Heckler v. Community Health Services,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) ("it is well settled that the Government may not be estopped on the same terms as any other litigant"). When public funds are involved the Supreme Court has adopted "a most strict approach to estoppel claims." *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 2472, 110 L.Ed.2d 387 (1990). When a party seeks a payment from public funds that is contrary to the purpose for which Congress appropriated the funds, a court has no authority to order such payment in reliance on the doctrine of estoppel. Such an order would violate the separation of powers principle that is fundamental to our form of government. *Richmond,* 110 S.Ct. at 2471–2473.

■ This court has held that "[a]t the very minimum some affirmative misconduct of a government agent is required as a basis of estoppel." *United States v. River Coal Co.,* 748 F.2d 1103, 1108 (6th Cir.1984). We find no intentional affirmative misconduct by any officer or agent of the government in this case. Rather, there was confusion because of imprecise references to "projects" and general assurances of grant funding for the *Element 2* Alter-native 1 sewer separation and treatment facilities program for Ecorse Creek.

Writing for the Court in *Richmond,* Justice Kennedy noted that the Supreme Court had "reversed every finding of estoppel [against the Government] that we have reviewed[ ]," 110 S.Ct. at 2470, and that the Court "has never upheld an assertion of estoppel against the Government by a claimant seeking public funds." *Id.* at 2476. Allen Park cannot prevail under a theory of estoppel.

### E.

MDNR argues that the district court should have denied Allen Park's motion for failure to exhaust administrative remedies. EPA does not join this argument. We believe EPA recognizes that the district court has jurisdiction to decide a wide range of issues raised by the parties in more than ten years of litigation and that the rule requiring exhaustion of administrative remedies has no application. This is not a case where a party to administrative proceedings resorted to a court to obtain review of an unfavorable decision. Allen Park was a defendant in this action from the beginning. The administrative decision was one that the district court clearly had the power to address rather than returning it to the agency, which had labelled its ruling a "final agency action."

The judgment of the district court is affirmed. Because Allen Park was responsible for much of the delay that caused the question of grant funding for its SSES to become an issue in the case, we will not require the appellants to pay any part of Allen Park's costs on appeal. Each party will bear its own costs.